# RAILWAY LABOR EXECUTIVES' ASSOCIATION *v.* UNITED STATES ET AL.

No. 337.   Argued February 14, 1950.—Decided March 27, 1950.

*Edward J. Hickey, Jr.* argued the cause for appellant. With him on the brief was *Clarence M. Mulholland.*

*Daniel W. Knowlton* argued the cause and filed a brief for the Interstate Commerce Commission, appellee.

*W. S. Macgill* argued the cause for the intervening railroads, appellees. With him on the brief were *Henry B. Curtis, Harry McCall* and *Henry L. Walker.*

*Solicitor General Perlman, Assistant Attorney General Bergson, Robert L. Stern* and *Richard E. Guggenheim* submitted on brief for the United States, appellee.

MR. JUSTICE BURTON delivered the opinion of the Court.

We are called upon to decide whether the Interstate Commerce Commission, in approving a consolidation of railroad facilities under § 5 (2) (f) of the Interstate Commerce Act,[1] has the power to extend the period of protection of the interests of the railroad employees beyond four years from the effective date of the order. For the reasons hereafter stated, we hold that the Commission has that power.

In 1947, the City of New Orleans, Louisiana, and several common carriers by railroad, all appellees herein, filed with the Interstate Commerce Commission a joint application for authority to construct, acquire and jointly own or use certain lines of railroad, as well as to abandon certain other lines or operations, as incidents to the construction of a passenger terminal at New Orleans. The Railway Labor Executives' Association, appellant herein, intervened as a representative of the interests of the employees of the railroads. Division 4 of the Commission entered a report and order, effective May 17, 1948,

---

[1] 54 Stat. 906–907, 49 U. S. C. § 5 (2) (f).

approving and authorizing the transactions.  *New Orleans Union Passenger Terminal Case,* 267 I. C. C. 763, and see *Oklahoma R. Co. Trustees Abandonment,* 257 I. C. C. 177, 197–201.

The order required the construction of the proposed lines to commence by December 31, 1948 (later extended to December 31, 1949), and to be completed by December 31, 1953 (later extended to December 31, 1954).   It contained detailed provisions for the compensatory protection of employees affected by the consolidation, but all such protection was to end by May 17, 1952.   The order disclosed that many employees affected by the consolidation would not be displaced until the completion of the project and that, therefore, they would receive no compensatory protection.[2]

After unsuccessfully seeking reconsideration and modification of the order by the full Commission, the appellant sued the United States (see 28 U. S. C. § 2322), in the District Court for the District of Columbia, asking that court to set aside that part of the Commission's order which limited the period of protection to four years. The Commission and the railroads intervened, answers

---

[2] "The total number of employees on the New Orleans lines that probably would be affected . . . has been estimated . . . at 1,022, and the number required to operate and maintain the union passenger terminal has been estimated at 680.   As provided in the terminal agreement, so far as feasible the terminal manager will recruit the necessary personnel from supervisory and other employees displaced at the 5 separate stations to be abandoned on completion of the union passenger terminal.   The estimates indicate a net displacement of about 350 employees, of whom 9 are bridge tenders and about 108 are crossing watchmen now employed on tracks which will be retired or over which train and yard movements will be reduced; but the opinion is expressed that the number eventually displaced will not exceed 300." *New Orleans Union Passenger Terminal Case,* 267 I. C. C. 763, 777–778.

were filed and, no facts being in dispute, all parties sought a summary judgment. The case was heard by a three-judge District Court (see 28 U. S. C. §§ 1336, 2325 and 2284) which granted the defendants' motions for summary judgment and dismissed the complaint. 84 F. Supp. 178. The case is here on direct appeal. 28 U. S. C. §§ 1253 and 2101 (b).

Section 5 (2) (f) of the Interstate Commerce Act provides:

"As a condition of its approval, under this paragraph (2), of any transaction involving a carrier or carriers by railroad subject to the provisions of this part, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees." 54 Stat. 906–907, 49 U. S. C. § 5 (2) (f).

The appellant and the United States [3] contend that the first sentence of § 5 (2) (f) requires the Commission to condition its approval upon a fair and equitable arrangement to protect the interests of railroad employees affected by this consolidation. They contend also that the second sentence prescribes a minimum of protection but does not restrict the Commission's power, under the first sentence, to prescribe further protection if such protection is deemed necessary to make the arrangement fair and equitable to the employees. The Commission, on the other hand, argues that the second sentence sets an inflexible standard for the fair and equitable arrangement required by the first sentence. The Commission concludes, therefore, that, in this case, it has power to require only such an arrangement as will prevent the affected employees from being in a worse position with respect to their employment for a maximum period of four years from the effective date of the order approving the project.[4]

Before the Transportation Act of 1940 brought § 5 (2) (f) into the Interstate Commerce Act, there was no statutory provision specifically requiring the protection

---

[3] Although in the District Court the United States supported the Commission, it has here filed a brief supporting the appellant.

[4] "As the record shows definitely that employees will be affected adversely by the applicants' proposals, it is appropriate in this case that we require a fair and equitable arrangement to protect the interests of employees so affected. We think that the benefit of such an arrangement necessarily must extend to all the railroad employees affected by exercise of the authorizations herein granted. But we also think that the fair and equitable arrangement contemplated by section 5 (2) (f) is measured by the specification therein of a protective period of 4 years from the effective date of our order approving a transaction within the scope of section 5 (2). As was decided in *Chicago, M., St. P. & P. R. Co. Trustees Construction*, *supra* [257 I. C. C. 292], we have no authority to prescribe any other period." *New Orleans Union Passenger Terminal Case*, 267 I. C. C. 763, 782.

of employees affected by consolidations of railroad facilities. The precursor of this provision was § 5 (4) (b), as amended by the Emergency Railroad Transportation Act of 1933. That section authorized the Commission to approve consolidations "upon the terms and conditions . . . found to be just and reasonable."[5] There was, however, a widespread awareness in the railroad industry that many of the economies to be gained from consolidations or abandonments could be realized only at the expense of displaced railroad labor. The interests of such employees were recognized in the Washington Job Protective Agreement of 1936.[6] This was a collective bargaining contract approved by about 85% of the railroad carriers and 20 of the 21 railroad brotherhoods. It contained a schedule of substantial financial benefits recommended for employees adversely affected by consolidations or so-called "coordinations."[7]

---

[5] ". . . If after such hearing the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed consolidation, . . . will promote the public interest, it may enter an order approving and authorizing such consolidation, . . . upon the terms and conditions and with the modifications so found to be just and reasonable." 48 Stat. 217.

[6] The agreement is published in the Hearings held by the House Committee on Interstate and Foreign Commerce on H. R. 2531, 76th Cong., 1st Sess. 231–241 (1939).

[7] George M. Harrison, President of the Railway Labor Executives' Association, recommended the enactment of the substance of the proposals of the Washington Agreement into law, so that the Commission might be able to make use of those proposals where appropriate. Those proposals included compensatory relief for employees, dating from the taking effect of a "coordination." As applied to a particular employee, the Agreement stated that the taking effect of a coordination "means the date in said period when that employee is first adversely affected as a result of said coordination." *Id.* at p. 232. It prescribed rates of compensation for employees deprived of their employment, for those continued in service but displaced from their former positions, and for those required to move to new

Section 5 (4) (b) and the Washington Agreement were both in effect when, in 1939, this Court held that the Commission had power to prescribe terms and conditions comparable to those in the Washington Agreement. *United States* v. *Lowden,* 308 U. S. 225. The Commission's requirement, in that case, of a protective period of five years was sustained. Thus, at the time of the enactment of § 5 (2) (f), the Commission already had power to determine and prescribe just and reasonable terms and conditions to protect employees affected by consolidations.[8]

The legislative history of § 5 (2) (f) shows that one of its principal purposes was to provide mandatory protection for the interests of employees affected by railroad consolidations. In 1938, the President appointed a Committee of Six to consider the transportation problem and recommend legislation.[9] It was composed equally of representatives of railroad management and railroad labor.

---

places of residence, etc. It related individual protective periods to prior lengths of service. In some instances, it limited relief to five years from the effective date of the coordination.

[8] It was estimated that the compensatory relief at issue in *United States* v. *Lowden, supra,* would consume, in five years, $290,000 out of the $500,000 of contemplated savings to result to the railroads. Shortly before that decision, Congress approved, in the bill still pending before it, the language which was to become the first sentence of § 5 (2) (f). This Court said of such approval: "We think the only effect of this action was to give legislative emphasis to a policy and a practice already recognized by § 5 (4) (b) by making the practice mandatory instead of discretionary, as it had been under the earlier act." *Id.* at p. 239. See also, *Interstate Commerce Commission* v. *Railway Labor Executives Assn.,* 315 U. S. 373, 379.

[9] Letter of December 23, 1938, transmitting a report to the President from a Committee appointed by him September 20, 1938, to consider the transportation problem and recommend legislation. Hearings before the Senate Committee on Interstate Commerce on S. 1310, 2016, 1869 and 2009, 76th Cong., 1st Sess. 3–5 (1939). See also, H. R. Doc. No. 583, 75th Cong., 3d Sess. 1 (1938), as to the earlier Committee of Three appointed for the same purpose.

They endorsed the Washington Agreement and recommended amending § 5 of the Interstate Commerce Act so as to include the following:

> "After the details of any proposed consolidation have been determined by the interests involved, they should be embodied in an application for approval, addressed to the Transportation Board. In passing upon such an application, the Board should be governed by the following considerations:
>
> .        .        .        .        .
>
> "(d) The interests of the employees affected. The Board shall examine into the probable results of the proposed consolidation and require, as a prerequisite to its approval, a fair and equitable arrangement to protect the interests of the said employees." [10]

March 30, 1939, Senators Wheeler and Truman introduced S. 2009, which, in § 49 (3) (c), contained substantially the above language:

> "The Commission shall require, as a prerequisite to its approval of any proposed transaction under the provisions of this section, a fair and equitable arrangement to protect the interests of the employees affected." [11]

---

[10] Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 2531, 76th Cong., 1st Sess. 275 (1939). And see supporting testimony of George M. Harrison at pp. 216–217. The Committee recommended vesting the protective power in a Transportation Board, for which the Interstate Commerce Commission was later substituted.

[11] As this provision was derived from the recommendation of the Committee of Six, the testimony of George M. Harrison, a member of that Committee, throws light upon its meaning. He said:

"In the report of the Committee of Six we do not undertake to lay down the specific, detailed protection that should be accorded labor by the Commission, but we were much of the opinion that in prescribing the protection the Commission would undoubtedly follow what seems to be generally the practice; and that is represented in an agreement that now exists between substantially all of the rail-

150

In the meantime, the House of Representatives considered a comparable bill, H. R. 4862, introduced by Representative Lea. Extended hearings were held. On the issue before us, this bill contained the same language as did the Senate bill. It required, as a prerequisite to the Commission's approval, "a fair and equitable arrangement to protect the interests of the employees affected." [12] When S. 2009 reached the House, the Committee in charge of it struck out everything after the enacting clause, substituted the text of the House bill and recommended its passage. In it, the provision in question took the form of an amendment to § 5 of the Interstate Commerce Act.

If this provision, which later became the first sentence of § 5 (2) (f), now stood alone as it did then, the Commission unquestionably would have power to grant at least as much relief to employees as it had under § 5 (4) (b). The crucial question is whether the second sentence of § 5 (2) (f), which was inserted soon thereafter, amounts not only to an additional provision for the protection of labor, but also to a limitation upon the discretion vested in the Commission by the first sentence.

The second sentence of § 5 (2) (f) has a significant history of its own. On the floor of the House, Representative Harrington suggested the following proviso to follow the first sentence:

*"Provided, however,* That no such transaction shall be approved by the Commission if such transac-

roads and all of the employees' labor unions. It provides a schedule of benefits and protections." Hearings before the Senate Committee on Interstate Commerce on S. 1310, 2016, 1869 and 2009, 76th Cong., 1st Sess. 34 (1938).

[12] H. R. Rep. No. 1217, 76th Cong., 1st Sess. 12 (1939), and see Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 2531, 76th Cong., 1st Sess. 184, 193–194, 214, 260 (1939).

tion will result in unemployment or displacement of employees of the carrier or carriers, or in the impairment of existing employment rights of said employees." [13]

The Harrington Amendment thus introduced a new problem. Until it appeared, there had been substantial agreement on the need for consolidations, together with a recognition that employees could and should be fairly and equitably protected. This amendment, however, threatened to prevent all consolidations to which it related.

With the Harrington Amendment in it the bill went to conference.[14] It came out with all provisions relating to consolidations under § 5 eliminated. The House, however, recommitted the bill to conference with instructions

---

[13] 84 Cong. Rec. Pt. 9, 9882 (1939).

This proposal was not without precedent. In the Emergency Railroad Transportation Act of 1933, 48 Stat. 211, there were many temporary provisions which originally were to expire in 1934 and finally did expire in 1936. Among these was § 7 (b). It provided that no employee was to be deprived of employment or be in a worse position with respect to his job by reason of any action taken pursuant to the authority conferred by the Act. That provision, on a temporary and independent basis, thus coexisted with the permanent amendments which were then made to § 5 of the Interstate Commerce Act, including § 5 (4) (b).

[14] While the bill was in conference, the Legislative Committee of the Interstate Commerce Commission sent a communication to Congress condemning the principle of the amendment and upholding the sufficiency of the first sentence of § 5 (2) (f):

"As for the [Harrington] proviso, the object of unifications is to save expense, usually by the saving of labor. Employees who may be displaced should, in the case of railroad unifications, be protected by some such plan as is embodied in the so-called 'Washington agreement' of 1936 between the railroad managements and labor organizations. The proviso, by prohibiting any displacement of employees, goes much too far, and in the long run will do more harm than good to the employees." Interstate Commerce Commission Report on S. 2009, Omnibus Transportation Legislation, p. 67 (76th Cong., 3d Sess., House Committee Print), transmitted January 29, 1940.

152

to insert a modified form of the first sentence of § 5 (2) (f), together with a modified form of the Harrington Amendment. The modification of the first sentence merely extended the original language as to fair and equitable arrangements so as to include abandonments as well as consolidations.[15] The modification of the Harrington Amendment is not now material.

The second conference reported § 5 (2) (f) in the final form in which it was enacted into law. It retained the first sentence in its original language.[16] In the second

---

[15] "(f) As a prerequisite to its approval of any consolidation, merger, purchase, lease, operating contract, or acquisition of control, or any contract, agreement, or combination mentioned in this section, in respect to carriers by railroad subject to the provisions of part 1, and as a prerequisite to its approval of the substitution and use of another means of transportation for rail transportation proposed to be abandoned, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. . . ." 86 Cong. Rec. Pt. 6, 5886 (1940).

[16] See H. R. Rep. No. 2832, 76th Cong., 3d Sess. 68–69 (1940), and remarks by Representative Lea, Chairman of House Conferees, 86 Cong. Rec. Pt. 6, 10178 (1940), and of Representative Wolverton at p. 10189.

The Commission's powers as to abandonments are thus left to § 1 (18)–(20), to which the Harrington Amendment has no possible application. They are as follows:

"(18) . . . no carrier by railroad subject to this Act shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

. . . . .

"(20) The Commission shall have power to issue such certificate . . . and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. . . ." 41 Stat. 477–478, 49 U. S. C. § 1 (18) and (20).

Under § 1 (18) and (20), the Commission has authority, in its sound discretion, to prescribe the period and the conditions of the protection needed by employees adversely affected by abandonments. See *Interstate Commerce Commission* v. *Railway Labor Executives*

sentence, however, it included a substantial change in the Harrington proposal. It limited it to the four years following the effective date of the Commission's order of approval. It provided also that in each case the protective period was not to exceed the length of each employee's employment by a carrier prior to the effective date of the Commission's order of approval. This clause emphasized the separability of the second sentence, for it provided that "the protection afforded to any employee pursuant *to this sentence* shall not be *required* to continue for a longer period, . . ." than that prescribed. (Emphasis supplied. See p. 145, *supra,* for full text of the clause.)

The second sentence thus gave a limited scope to the Harrington Amendment and made it workable by putting a time limit upon its otherwise prohibitory effect. There was no comparable need for such a restriction upon the first sentence. We find, therefore, that the time limit in the second sentence now applies to it and to it alone. As thus limited, that sentence adds a new

---

*Assn.,* 315 U. S. 373. In that case, this Court reversed the narrow interpretation which had been given by the Commission to § 1 (20) in *Chicago G. W. R. Co. Trackage,* 207 I. C. C. 315, 322. The Commission had held that it was without authority to prescribe conditions for the protection of the interests of the displaced employees. Both the District Court of the District of Columbia and this Court recognized that the authority granted by § 1 (18)–(20) might be narrower than that applicable to consolidations under § 5 (4) (b) (see *United States* v. *Lowden,* 308 U. S. 225) but held, nevertheless, that it gave the Commission authority to protect the employees affected. Under the restrictive interpretation which the Commission seeks to apply to its power in the instant case, it would be prohibited from applying its full discretion to employees displaced by consolidations, at the same time that it is authorized to apply its full discretion to those displaced by abandonments. See *Interstate Commerce Commission* v. *Railway Labor Executives Assn.,* 315 U. S. 373. This distinction would be peculiarly discriminatory in the instant case where the consolidation includes many abandonments.

guaranty of protection for the interests of employees, without restricting the Commission's power to require greater protection as part of a fair and equitable arrangement. This serves the purpose of the sentence to increase, rather than to decrease, the protective effect of the paragraph.

Under the Commission's order in the instant case, employees displaced through the early elimination of grade crossings or otherwise may receive compensatory protection up to May 17, 1952, but employees displaced after that date will receive none. They will have had long notice that, by 1954, they may be displaced. But that much "protection" against the adverse effects of the consolidation would have been available to them without § 5 (2) (f). Neither such discrimination nor such insubstantial "protection" is consistent with the purpose or the history of the provision.

The Commission's interpretation of this statute, although entitled to weight, is not persuasive. Its present view of its authority is out of harmony with its broad view of its authority under § 5 (4) (b), approved in *United States* v. *Lowden, supra.* It also is inconsistent with the broad construction given by this Court to § 1 (18)–(20) as to abandonments. *Interstate Commerce Commission* v. *Railway Labor Executives Assn.,* 315 U. S. 373. The Commission's own decisions under § 5 (2) (f), relied upon here, have been made in cases in which the adverse effects of the approved transactions were to be felt by the employees long before the expiration of four years from the effective date of the order of approval.[17] For example, in *Chicago, M., St. P. & P. R. Co. Trustees Construction,* 257 I. C. C. 292, which is principally relied

---

[17] *Chicago, B. & Q. R. Co. Abandonment,* 257 I. C. C. 700; *Chicago, M., St. P. & P. R. Co. Trustees Construction,* 257 I. C. C. 292; *Oklahoma R. Co. Trustees Abandonment,* 257 I. C. C. 177, 196–202; *Texas & P. R. Co. Operation,* 247 I. C. C. 285, 295, 296.

upon by the Commission, the construction originally was required to be completed December 31, 1943, and that date was extended to December 31, 1944, but the effective date of the order of approval was April 26, 1942, so that the minimum protective period of four years did not expire until 1946. In that case, the Commission did not eliminate all compensatory protection as it has for many employees here.

We conclude, therefore, that the Commission, while required to observe the provisions of the second sentence of § 5 (2) (f) as a minimum protection for employees adversely affected, is not confined to the four-year protective period as a statutory maximum. The Commission has the power to require a fair and equitable arrangement to protect the interests of railroad employees beyond four years from the effective date of the order approving the consolidation.

The judgment of the District Court is reversed and the case is remanded to that court with directions to remand it to the Interstate Commerce Commission for further proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE JACKSON dissents upon the ground that resort to legislative history to vary the terms of the statute is not justified in this case.

MR. CHIEF JUSTICE VINSON and MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE REED joins, dissenting.

The sole question before us is the proper construction to be given to the amendment made to § 5 (2) (f) of the Interstate Commerce Act by the Act of September 18, 1940, 54 Stat. 898, 906–07. The District Court agreed

with the construction given to the provision by the Interstate Commerce Commission. In the court below, but not here, the Department of Justice joined the Interstate Commerce Commission in urging this construction upon that court. I do not think the arguments which the Government urged below have been adequately answered, and I therefore yield to them. I cannot do better than state them in the Government's own language:

"The section contains the clear and precise provision that the four-year period shall commence from the effective date of the order of approval. Had Congress intended that the period shall run from the date when the consolidation goes into effect or, as argued by plaintiff, from the date the employees are adversely affected, such words easily could and would have been used by Congress. Nor does the section give to the Commission discretion in applying a period other than four years from the effective date of the order of approval. The terminology in the statute is that the Commission *shall* include the four-year limitation therein provided. To provide a different period in the Commission's order would be contrary to the specific requirement imposed upon the Commission by the statute.

.     .     .     .     .

"Congress deliberately fixed the period of protection to start from the effective date of the order and not the date an employee is adversely affected.

.     .     .     .     .

"In the light of the clear unambiguous and specific language of Section 5 (2) (f), its consistent interpretation and application by the Commission, since its enactment and over a long period of years, and the legislative history of the statute, the order of the Commission herein should not be disturbed."

I would affirm the judgment of the District Court.