Terence P. McLAUGHLIN, Plaintiff,

v.

**PENN CENTRAL TRANSPORTATION COMPANY et al., Defendants.**

No. 72 Civ. 5282.

United States District Court,
S. D. New York.

Oct. 29, 1974.

McGowan & McGowan, New York City, for plaintiff; William J. McGowan, New York City, of counsel.

Robert M. Peet, New York City, for defendant Penn Cent. Transp. Co., Debtor in Reorganization; James L. More, New York City, of counsel.

Mulholland, Hickey & Lyman, Washington, D. C., Reilly, Fleming & Reilly, New York City, for defendants System Council #7, International Brotherhood of

Electrical Workers and its General Chairman Russell Homiak; Edward J. Hickey, Jr., William J. Hickey, William E. Fredenberger, Jr., David J. Fleming, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is the second action commenced by plaintiff against the defendant Penn Central Transportation Corporation and its trustees in reorganization (Penn Central), by whom he is and has been employed as an electrician at its Grand Central Terminal. Plaintiff claims that since May 1971 he has suffered a worsening of his working conditions by reason of discontinuances of passenger trains pursuant to the Rail Passenger Service Act of 1970,[1] and that he is therefore entitled to employees' benefits mandated by that Act and by section 5(2)(f) of the Interstate Commerce Act.[2] In this second action plaintiff has also named as defendants System Council #7, International Brotherhood of Electrical Workers and its General Chairman, Russell Homiak (the Union). The complaint in the instant suit was filed two days after Judge Lasker granted summary judgment in favor of Penn Central, dismissing plaintiff's first action on the ground that "the record establishe[d] beyond dispute that McLaughlin's compensation rate ha[d] not been adversely affected," and that it failed to establish that he had been put "into a worse position with respect to the *rules* governing his working position."[3]

The defendants now move to dismiss the complaint under Rule 12 of the Federal Rules of Civil Procedure upon various grounds, including res judicata, failure to state a claim upon which relief may be granted, and lack of subject matter jurisdiction; and for summary judgment under Rule 56 upon the ground that there is no genuine issue of fact— that, in fact, plaintiff's condition of employment was not worsened. The plaintiff cross-moves to maintain the suit as a class action to include the other car department electricians at Grand Central Terminal, and to require the Union to negotiate with Penn Central the terms of employment for employees affected by the discontinuance of trains.

The Rail Passenger Service Act of 1970 created a quasi-public agency, the National Railroad Passenger Corporation (Amtrak), the essential purpose of which was to establish a modern and efficient nationwide rail passenger service through a basic and unified system for intercity rail passenger service and the discontinuance of lines not required for that purpose.[4] Amtrak was authorized to enter into contracts with railroads to relieve them of the responsibility for the operation of lines to be included in the basic system,[5] provided, among other matters, that adequate protective arrangements for affected employees were incorporated into the agreements, referred to as service agreements, under which the railroads were to provide Amtrak with the servicing and operating of passenger trains; and further, provided that the Secretary of Labor certified that such protective arrangements afforded affected employees fair and equitable protection.[6]

On April 16, 1971, Penn Central and Amtrak entered into a service contract effective on and after May 1, 1971, and the contract's labor protection provisions, section 7.3 and Appendices C–1 and C–2, were certified by the Secretary of Labor as affording fair and equitable protection of employees. The plaintiff

1. 45 U.S.C. § 501 et seq. (1970).

2. 49 U.S.C. § 5(2)(f) (1970).

3. 72 Civ. 1876, at 3 (S.D.N.Y., Dec. 12, 1972). Plaintiff filed a notice of appeal from the judgment dismissing his action, but to date it has not been prosecuted.

4. 45 U.S.C. §§ 501, 521, 522 (1970).

5. 45 U.S.C. § 561(a)(1) (1970).

6. 45 U.S.C. § 565(a), (b) (1970).

does not challenge the Secretary of Labor's determination that those provisions are fair and equitable and meet the requirements of the Act.[7]

Appendix C–1, among other matters, mandates payments to a displaced employee, defined as one "who, as a result of a transaction [a discontinuance of intercity rail passenger service] is placed in a worse position with respect to his compensation and rules governing his working conditions."[8] Plaintiff's claim, however phrased, is that he was placed in a "worse" position based on two "transactions" or discontinuances, one on May 1, 1971, and the other on April 30, 1972. In essence, he alleges that as a result of those "transactions" he was "disturbed" from his original position as an electrician at Grand Central Station servicing principally intercity passenger trains, and that he thereafter was assigned to work principally on commuter and suburban trains, with consequent loss of earnings and a worsening in the conditions of his employment. Plaintiff's claim against the Union is that it failed, upon notification by Penn Central of the proposed discontinuances, to request that the railroad enter into an "implementing agreement"[9] regarding the assignment of employees pursuant to Article I, section 4 of the Appendix, and sections 4 and 5 of the Washington Agreement.[10]

We pass for the moment Penn Central's plea that this action is barred under the doctrine of res judicata or collateral estoppel by reason of the judgment dismissing the first action, and consider the motions made by both defendants to dismiss for lack of subject matter jurisdiction, failure to state a claim upon which relief may be granted and failure to exhaust contractual remedies.

Plaintiff contends that the complaint states a claim under the Interstate Commerce Act, the Railway Labor Act and the Rail Passenger Service Act of 1970. The contention that the complaint states a claim under section 5(2)(f) of the Interstate Commerce Act[11] and that the court has jurisdiction under that Act[12] is without substance, since the case does not involve an order of the Interstate Commerce Commission approving a merger or consolidation of railroads or their acquisition or control.[13] So, too, the contention that Penn Central violated a collective bargaining agreement, referred to as the Washington Agreement of 1936, is without substance, because that agreement is expressly limited to employees adversely affected by consolidations or so-called

---

7. It has been held that these provisions not only satisfy the requirements of the Act, but "in fact exceed these requirements in significant respects." Congress of Railway Unions v. Hodgson, 326 F.Supp. 68, 76 (D.D.C. 1971).

8. Appendix C–1, Article 1, ¶ 1(a), (b).

9. An "implementing agreement" in railroad jargon is, as indicated by the nomenclature, an agreement which implements or provides the procedures whereby the benefits of a prior basic agreement (here, Appendix C–1, the protective arrangement certified by the Secretary of Labor) are to be applied to affected employees. In applicable circumstances an implementing agreement will set forth procedures for the "rearrangement" of work forces, the integration of seniority dates when employees from one seniority point are consolidated or combined with employees of another seniority point, and pay-

ments for travel time and moving expenses, such as will occur with the transfer of railroad work from one point to another on one railroad.

10. The Washington Agreement is discussed in Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 173, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961); Railway Labor Executives Ass'n v. United States, 339 U.S. 142, 147–149, 70 S.Ct. 530, 94 L.Ed. 721 (1950); United States v. Lowden, 308 U.S. 225, 234, 60 S.Ct. 248, 84 L.Ed. 208 (1939).

11. 49 U.S.C. § 5(2)(f) (1970).

12. 49 U.S.C. §§ 8, 9, 16(2); 28 U.S.C. § 1337 (1970).

13. 49 U.S.C. § 5(2)(a) (1970); see, e. g., Norfolk & Western R. R. v. Nemitz, 404 U.S. 37, 40, 42, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971).

"coordinations."[14] Obviously this case does not involve a coordination.[15] Moreover, even if plaintiff's claim were within the purview of the Washington Agreement pertaining to coordinations, the court would not have jurisdiction of the dispute, because plaintiff has failed to exhaust the procedures set forth in section 13 of that agreement, which requires that a dispute or controversy be referred for determination to a committee and, if the committee is unable to agree, to a neutral referee whose determination shall be final and conclusive.[16]

Plaintiff's further contention that the complaint states a claim under the Railway Labor Act[17] because a violation of the Amtrak agreement is within the purview of that Act is without merit, since the Amtrak agreement is not a collective bargaining agreement, but a private contract between two corporations.[18] But even if plaintiff's position that the Railway Labor Act grounds his claim were accepted, the court would not have jurisdiction of this dispute because plaintiff has failed to present his claim in accordance with the mandatory procedures of that Act.[19]

Thus, we reach plaintiff's contention that the complaint states a claim under section 405 of the Rail Passenger Service Act of 1970[20] with jurisdiction based upon section 307(a) of that Act,[21] which provides:

"If the Corporation or any railroad engages in or adheres to any action, practice, or policy inconsistent with the policies and purposes of this Act, obstructs or interferes with any activities authorized by this Act, refuses, fails, or neglects to discharge its duties and responsibilities under this Act, or threatens any such violation, obstruction, interference, refusal, failure, or neglect, the district court of the United States for any district in which the Corporation or other person resides or may be found shall have jurisdiction, except as otherwise prohibited by law, upon petition of the Attorney General of the United States or, in a case involving a labor agreement, upon petition of any employee affected thereby, including duly authorized employee representatives, to grant such equitable relief as may be necessary or appropriate to prevent or terminate any violation, conduct, or threat."

Plaintiff contends in essence that this action is maintainable under the foregoing section, since it is for a declaratory judgment to enforce the protections and benefits mandated by section 405 of the Act and implemented by the terms of Appendix C–1. The Supreme Court, however, has held that section 307(a) created a public cause of action maintainable by the Attorney General to enforce the duties and responsibilities imposed by the Act, and that the only private cause of action created thereunder is limited to a "case involving a labor agreement."[22] Is this a case involving a labor agreement? Clearly it is not. Appendix C–1, certified by the Secretary

14. *See* Railway Labor Ass'n v. United States, 339 U.S. 142, 147, 70 S.Ct. 530, 94 L.Ed. 721 (1950).

15. Section 2(a) of the Washington Agreement provides: "The term 'coordination' as used herein means joint action by two or more carriers whereby they unify, consolidate, merge or pool in whole or in part their separate railroad facilities or any of the operations or services previously performed by them through such separate facilities."

16. That section 13 provides that such disputes "may be referred" to such a committee does not make the procedure optional. *See* note 26 *infra* and accompanying text.

17. 45 U.S.C. § 151 et seq. (1970).

18. *See* Tribbett v. Chicago Union Station Co., 352 F.Supp. 8, 11 (N.D.Ill.1972).

19. 45 U.S.C. § 153 First (i) (1970); Andrews v. Louisville & N. R. R., 406 U.S. 320, 322, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972).

20. 45 U.S.C. § 565 (1970).

21. 45 U.S.C. § 547(a) (1970).

22. National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers, 414 U.S. 453, 457, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

of Labor to implement adequate protection of Penn Central employees affected by discontinuances, is part of the private operating agreement between Penn Central and Amtrak. The Union is not a party to that agreement. The agreement is therefore not a labor agreement, and the case is not maintainable by plaintiff as a private action.[23]

Moreover, even if this case did involve a labor agreement, it would fail for plaintiff's failure to exhaust the procedures available to him under the terms of Appendix C–1. When plaintiff first advanced his contention that his position was worsened, he sought a determination from the Secretary of Labor, apparently relying upon Article IV of the Appendix, which provides that disputes between the railroad and employees "not represented by a Labor Organization" may be referred to the Secretary of Labor, whose determination shall be final. Plaintiff was advised by the Secretary of Labor that, although he was not a member of the Union, he was employed in a position falling within the bargaining unit represented by it, and that "[u]nder well recognized labor law the bargaining representative for a unit must represent, fairly, all employees in the unit, irrespective of whether or not they hold union membership." He was further advised that since he did not qualify as an employee "not represented by a Labor Organization," Article IV remedies were not available to him; that his remedy was to proceed under Article I, section 11 of Appendix C–1, either on his own behalf or through the Union. Plaintiff did not accept the advice; he proceeded neither on his own behalf nor through the Union. The Union asserts that although plaintiff is not a member, it has continued to represent plaintiff as a member of the craft or class of electricians employed by Penn Central. The Union further asserts, and

plaintiff does not deny, that he has not requested it to process any grievance with Penn Central or to aid or assist him in doing so.

Appendix C–1 contains two arbitral provisions. Under Article I, section 4, upon notice by a railroad of a transaction after May 1, 1971, and at the request of the railroad or representatives of interested employees, negotiations for implementing agreements[24] are to be commenced, and if they are unresolved within twenty days, either party may submit the issue for adjustment to a neutral referee, whose decision is to be final, binding and conclusive. The Union concedes, as plaintiff alleges, that it did not negotiate or enter into an implementing agreement. The Union, however, contends that not every notice of a transaction automatically requires an implementing agreement, provided the affected employees receive the benefits set forth in Appendix C–1; and that in this instance the failure to negotiate and execute an implementing agreement will not deprive an affected employee of required benefits, since Article I, section 4(d) of Appendix C–1 contains full protective provisions for all such employees. Whatever the merits of this claim, the fact is that if there had been negotiations for an implementing agreement, and a dispute arose, it would have been subject to final determination by the neutral referee. Plaintiff cannot escape the arbitral provision because no implementing agreement was negotiated or found necessary, as the Union contends. Plaintiff, no less than the Union, is bound by the terms of that provision. The fact that he is a non-member of the Union gives him no greater right than the Union, which is the collective bargainer for all employees, including plaintiff.

Additionally, Article I, section 11(a) of the Appendix provides that a dispute

23. National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers, 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974); Congress of Railway Unions v. Hodgson, 326 F. Supp. 68, 78–79 (D.D.C.1971).

24. The nature of an implementing agreement is discussed in note 9 *supra.*

between the railroad and its employees or their authorized representatives, with respect to the interpretation, application or enforcement of any provision of the Appendix except sections 4 and 12 of Article I, "may be referred by either party to an arbitration committee of three," the decision of the majority to be "final, binding and conclusive." In this instance, too, it is not denied that plaintiff did not request that this arbitration procedure be invoked and that in fact it was not invoked.

The basic policy of the Railway Labor Act, with its various amendments and collateral statutes involving the nation's transportation system, has been to relegate controversies between labor and management to the arbitral process.[25] There is nothing in the history of the Rail Passenger Service Act to suggest that this policy has been relaxed in that Act. Plaintiff professes to see an exception in the Amtrak legislation on the ground that no collective bargaining agreement is involved in the "transactions" that gave rise to his claim (a position that is inconsistent with his contention that he may maintain a claim under section 307(a)). Here he argues that his action is one for a declaratory judgment to enforce protective rights

set forth in Appendix C–1, as approved by the Secretary of Labor. However, the Appendix requires submission of controversies to the arbitral process; plaintiff must exhaust those remedies and procedures, and he has failed to do so.

■ The claim that section 11(a) of Article I does not require exhaustion of remedies, because it provides that a dispute "may be referred" by either party to an arbitration committee, is without substance. Under principles of construction applicable to statutory and contractual provisions establishing employee grievance procedures, the term "may" in Article I, sections 4 and 11 of the Appendix is mandatory—the employee must exhaust those procedures before resorting to the courts.[26]

■ Plaintiff's contention that the arbitration procedures were exhausted when the Secretary of Labor refused to arbitrate his alleged dispute [27] is without merit. Plaintiff was correctly advised by the Secretary of Labor that "[u]nder well recognized labor law the bargaining representative for a unit must represent, fairly, all employees in the unit, irrespective of whether or not they hold union membership." [28] It is clear that even though plaintiff is a

25. *See* Andrews v. Louisville & N. R. R., 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972).

26. *See* Andrews v. Louisville & Nashville R. R., 406 U.S. 320, 92 S.Ct. 1563, 32 L.Ed.2d 95 (1972), which so construed the term "may" in section 3 First (i) of the Railway Labor Act, 45 U.S.C. § 153 First (i) (1970); Republic Steel Corp. v. Maddox, 379 U.S. 650, 652–653, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Bonnot v. Congress of Ind. Unions Local # 14, 331 F.2d 355, 359 (8th Cir. 1964). In *Bonnot*, Judge, later Mr. Justice Blackmun, observed that "[t]he obvious purpose of the 'may' language is to give an aggrieved party the choice between arbitration or the abandonment of its claim." Id. *See also* Walker v. Southern Ry., 385 U.S. 196, 87 S.Ct. 365, 17 L.Ed.2d 294 (1966).

Plaintiff, citing Batts v. Louisville & Nashville R. R., 316 F.2d 22 (6th Cir. 1963), argues that the "may" clause becomes mandatory only when arbitration is

invoked by one of the parties to the dispute. While it is true that the clause is mandatory in that situation, neither *Batts* nor the other cases cited by plaintiff are authority for his argument that the arbitration clause must be invoked to become mandatory.

27. *See* Bieski v. Eastern Automobile Forwarding Co., 396 F.2d 32, 38 (3d Cir. 1968), which held that "[i]f . . . the private decision complained of is a 'jurisdictional' one—that a certain dispute will not be considered on its merits by the private decision-maker—then the court is a proper forum to review this decision on the basis of its analysis of the contract entered into by the parties."

28. *See* Steele v. Louisville & N. R. R., 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944); O'Mara v. Erie Lackawanna R. R., 407 F.2d 674, 678 (2d Cir. 1969), aff'd sub nom. Czosek v. O'Mara, 397 U.S. 25, 90 S. Ct. 770, 25 L.Ed.2d 21 (1970).

non-union employee, he is represented by the Union; he is therefore not entitled to invoke the arbitral process under Article IV of Appendix C–1. He was required to exhaust the grievance procedure specified in Article I, section 11 of Appendix C–1, and this he failed to do. While it is not necessary to the disposition of these motions, it is noted that even if plaintiff had pursued the procedure set forth in Article I, section 11, and a determination had been made by the arbitration committee, it would not be "open to the courts to reweigh the merits of the grievance," [29] because that section provides that "the decision by a majority vote of the arbitration committee shall be final, binding and conclusive." For all the foregoing reasons, plaintiff has not stated a claim under the Rail Passenger Service Act of 1970.

Plaintiff's further claims against the Union are based on alleged violations of its "duty of fair representation," a statutory duty imposed on the Union by the Railway Labor Act.[30] Plaintiff contends that the Union violated this duty by failing to obtain a "displacement allowance" for him, and, as already noted, by failing to enter into an implementing agreement with the railroad regarding the assignment of employees pursuant to Article I, section 4 of the Appendix. The first claim is frivolous; plaintiff does not even allege that he made a demand on the Union to process a claim for a displacement allowance.[31] So, too, the second claim is without substance because plaintiff does not allege that the Union discriminated against him by its failure to enter into an implementing agreement with the

railroad, much less that he was the victim of hostility, bad faith, or arbitrary discrimination.[32]

Plaintiff's failure to state claims upon which relief can be granted and failure to exhaust contractual and administrative remedies provide two independent grounds for dismissal of his complaint. In addition, under the doctrine of res judicata, plaintiff's suit is barred by the judgment dismissing plaintiff's action entered upon Judge Lasker's ruling. In both this action and the action before Judge Lasker, plaintiff claimed that the discontinuances or "transactions" of May 1, 1971 and April 30, 1972 placed him in a "worse position." Essentially his claim in the first action was predicated upon a notice dated May 4, 1972, to become effective May 10 (later extended to May 17), served by one Lavelle, an employee senior to plaintiff, whereby plaintiff would be displaced or "bumped" from his job, whereupon he in turn would "bump" a more junior electrician. In that first action plaintiff specifically referred to this event, alleging it would have the effect of "disturbing" him from his position, and sought to enjoin Penn Central from putting it into effect. Plaintiff's motion for a preliminary injunction was denied following an evidentiary hearing on May 11, 1972.

Thereafter, on December 12, 1972, Judge Lasker filed his opinion granting summary judgment, wherein, among other matters, he stated:

"Defendants maintain that McLaughlin has not been harmed in any way, . . . that [he] has continued to work as an electrician at Grand

---

29. Drivers Local 89 v. Riss & Co., 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918 (1963).

30. Steele v. Louisville & N. R. R., 323 U.S. 192, 202, 65 S.Ct. 226, 89 L.Ed. 173 (1944); see also Amalgamated Ass'n of Street Employees v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 350, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964);

Ford Motor Co. v. Huffman, 345 U.S. 330, 337–338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

31. Cf. O'Mara v. Erie Lackawanna R. R., 407 F.2d 674, 677 (2d Cir. 1969), aff'd sub nom. Czosek v. O'Mara, 397 U.S. 25, 90 S.Ct. 770, 25 L.Ed.2d 21 (1970).

32. See Amalgamated Ass'n of Street Employees v. Lockridge, 403 U.S. 274, 301, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); Vaca v. Sipes, 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

Central at the same rate he had been receiving, and, in fact, has received an increased rate since April 1st, 1972. . . . They further point out that McLaughlin may presently exercise seniority over jobs available in Grand Central Terminal at the same wage rate he is now receiving. . . .

McLaughlin has not disputed these contentions. . . ."

Judge Lasker, after noting the definition of a displaced person in the Appendix as an employee "placed in a worse position *with respect to his compensation and rules governing his working conditions*," found that the record established that "McLaughlin does not qualify as a 'displaced person,' and consequently is not entitled to relief as claimed."

Thereupon, on the very day that Judge Lasker's opinion was filed, plaintiff verified his complaint in this action, which was filed on December 14, and in which he seeks essentially the same relief predicated upon the Lavelle event. While plaintiff here seeks to maintain his claim upon various theories previously referred to, the basic thrust of his complaint is that the Lavelle incident "disturbed" him in his job "without the application of the protection and benefits mandated by the applicable statutes." [33] Attached to the complaint in this action as an exhibit is the same notice by Lavelle, asserting his seniority rights, which was also attached as an exhibit to his complaint in the first action.

Upon its face it appears that plaintiff is asserting the very claim adjudicated adversely to him by Judge Lasker. That plaintiff alleges different legal theories in this action or clothes his claim in a different garb does not defeat the defense of res judicata.[34] The determinative fact is that this second action, so commenced when the ink was hardly dry on the judgment in the first action, presents no new facts with respect to plaintiff's claim that his position was worsened by the Lavelle displacement. From the denial of preliminary relief by Judge Lasker on May 11 to December 12, 1972, when summary judgment was entered dismissing plaintiff's complaint upon a finding that plaintiff's position had not worsened, his displacement had been in effect seven months. In the interim he presented no new facts by way of amended complaint or otherwise; [35] further, from the dismissal of his complaint on December 12 to the filing of this action, two days later, again nothing has been presented to overcome the binding force of the prior judgment. Thus the defense of res judicata also requires dismissal of plaintiff's complaint.

33. ¶ 18 of complaint.

34. *See* Goldstein v. Doft, 236 F.Supp. 730, 734 (S.D.N.Y.1964), aff'd, 353 F.2d 484 (2d Cir. 1965); Frost v. Bankers Commercial Corp., 11 F.R.D. 195 (S.D.N.Y.1951), aff'd, 194 F.2d 505 (2d Cir. 1952).

35. *See* Buchanan v. General Motors Corp., 158 F.2d 728 (2d Cir. 1947).