**AMERICAN TRAIN DISPATCHERS ASSOCIATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**CSX Transportation, Inc., Intervenor.**

No. 94–1036.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 27, 1995.

Decided May 19, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied July 21, 1995.

---

Gordon P. MacDougall argued the cause and filed the briefs, for petitioner.

Judith A. Albert, Atty., I.C.C. argued the cause, for respondents. With her on the brief were Henri F. Rush, Gen. Counsel, John J. McCarthy, Jr., Associate Gen. Counsel and Virginia Strasser, Atty., I.C.C., Anne K. Bingaman, Asst. Atty. Gen., John J. Powers, III and Robert J. Wiggers, Attys., U.S. Dept. of Justice.

James S. Whitehead argued the cause, for intervenor. With him on the brief was James D. Tomola.

Before WALD, RANDOLPH and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge ROGERS.

Opinion dissenting in part filed by Circuit Judge WALD.

ROGERS, Circuit Judge:

Petitioner American Train Dispatchers Association (the "Union") seeks review of three orders of the Interstate Commerce Commission concerning the interpretation of Article I, § 5(a) of the *New York Dock* conditions, designed to protect employees affected by railroad consolidations. The Union challenges both the Commission's initial orders requiring submission of the dispute to arbitration, and the Commission's affirmance of the arbitrator's decision that the carrier had properly excluded transaction-related overtime earnings in calculating the employees' displacement allowance. We conclude that the Commission's interpretations are permissible and therefore deny the petition for review.

## I.

The Interstate Commerce Act (the "ICA") vests the Commission with exclusive authority to examine, condition, and approve proposed rail carrier mergers and consolidations. 49 U.S.C. §§ 11341–11351 (1988). The ICA also requires the Commission to impose on such mergers certain labor-protective conditions, which are designed to shield railroad workers from the adverse effects of industry upheaval. *See* 49 U.S.C. § 11347; *Norfolk & Western Ry. Co. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 132–33, 111 S.Ct. 1156, 1165–66, 113 L.Ed.2d 95 (1991). To comply with § 11347, the Commission has announced a comprehensive set of arbitration procedures and employee benefits, known as the *New York Dock* conditions, that apply to railway job consolidations. *See New York Dock Ry.—Control—Brooklyn E. Dist. Terminal*, 360 I.C.C. 60, 84–90 (1979) ("*New York Dock*"), *aff'd sub nom. New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir.1979).

One condition imposed by *New York Dock* requires railroads to compensate its employees who are adversely affected by a Commission-approved consolidation. Under *New York Dock*, Article I, § 5(a), the carrier must replace the lost wages of such employees for up to six years following a consolidation or merger. *See New York Dock*, Art. I, § 5(a), 360 I.C.C. at 86 (quoted *infra* at pp. 848–849). In each month during the protected period, the employee is entitled to a displacement allowance equal to the difference between the employee's actual earnings and the "average monthly compensation" earned during a test period prior to the consolidation.

In 1987, CSX Transportation, Inc. announced a plan to consolidate its train dispatching operations into a single facility in Jacksonville, Florida. *See American Train Dispatchers Ass'n v. CSX Transp., Inc.*, 9 I.C.C.2d 1127, 1128–29 (1993) ("*Third Order*"). The Union and CSX entered into an Implementing Agreement in January 1988 to govern the consolidation; the terms of the Agreement entitled employees to the protective benefits of *New York Dock*. The plan required dispatchers taking jobs at the new location to relocate to Florida and undergo training on a new computerized dispatching system, in many cases before their former duty stations had closed. As a result, vacancies and personnel shortages existed in a number of offices during the transfer period, and a number of dispatchers who remained behind logged unusual amounts of overtime. The terms of their employment required dispatchers to work overtime when necessary.

Pursuant to *New York Dock*, CSX prepared average monthly compensation statements for approximately 250 dispatchers who were displaced during the first phase of the reorganization. In computing the test period average, the carrier deducted the overtime earnings that were traceable to the consolidation transaction, maintaining that the labor protective conditions did not require inclusion of such extraordinary earnings.[1] The

---

1. To identify transaction-related overtime, CSX compared an employee's average hours worked each month during the twelve month test period with that employee's average monthly hours dur-

ing an eight month period ending January 31, 1988, just prior to the commencement of the consolidation. Using this control period to determine whether the employee's overtime hours

Union objected to the deductions and filed a complaint with the Commission, seeking an order requiring CSX to include the transaction-related overtime earnings in the average compensation figure. The Commission dismissed the complaint in favor of initial resolution through arbitration under *New York Dock*, Article I, § 11. *See American Train Dispatchers Ass'n v. CSX Transp., Inc.*, Fin. Doc. No. 28905 (Sub–No. 24) (served June 25, 1990) (*"First Order"*). Over objection, the Union submitted its claims to arbitration.[2]

An arbitral panel decided that CSX had properly excluded the dispatchers' transaction-related overtime.[3] The panel determined that neither Congress nor the Commission had clarified the meaning of "total compensation," instead leaving it to arbitrators to interpret the term on a case-by-case basis. Reviewing previous arbitration decisions under the various precursors to *New York Dock*, the panel found that the preponderance of arbitral precedents had adopted the position urged by CSX. Over the dissent of the Union member, the panel majority concluded that a contrary interpretation would create an unintended windfall for employees throughout the six year protective period—a result inconsistent with the labor conditions' limited purpose of protecting employees from suffering adverse effects to their normal earnings as a result of the transaction.

The Commission denied the Union's appeal of the arbitration decision. *See Third Order*, 9 I.C.C.2d at 1128. Noting that its general scope of review for arbitral awards is highly deferential, the Commission acknowledged that "when reviewing an arbitrator's interpretation of the Commission's labor conditions, the agency is entitled to subject it to 'more searching review.'" *Id.* at 1131 (citing *Railway Labor Exec. Ass'n v. United States*,

987 F.2d 806, 812 (D.C.Cir.1993)). The Commission then affirmed the award on the ground that a literal interpretation of § 5(a) conflicted with other provisions in the *New York Dock* conditions as well as the conditions' "overall policy ... that employees be protected only against those losses that are caused by the transaction." *Id.* at 1134.

The Commission also rejected the Union's challenges to the representative use of Mr. Barr's claim, *see supra* note 3, and to the method by which CSX calculated the amount of transaction-related (and thus excludable) overtime, *see supra* note 1. The Commission emphasized that its review of the arbitral award was concerned solely with whether transaction-related overtime could be properly excluded under *New York Dock*, and that for that purpose the focus on Mr. Barr was appropriate. *See id.* at 1133. With respect to the methodology CSX used to identify and exclude transaction-related overtime, the Commission generally approved the use of a pre-transaction control period to establish a baseline level of overtime hours that could then be compared with overtime hours accrued in the course of the transaction. *Id.* at 1135. At the same time, however, the Commission noted that the transaction-related nature of the overtime was undisputed in Mr. Barr's case, and twice acknowledged that other displaced employees could challenge the carrier's calculation with respect to their own overtime earnings. *See id.* at 1133, 1135.

## II.

In remitting the Union's dispute with CSX to arbitration, the Commission recognized that "the Commission itself has considered, as a general matter, whether the compensation received by employees satisf[ies] statuto-

---

had been inflated during the test period, CSX then deducted the "excess" hours from the test period's average monthly hours, and reduced the average monthly earnings by the straight-time earnings rate associated with the excess overtime. *See Third Order*, 9 I.C.C.2d at 1129 n. 6.

**2.** The Commission denied the Union's petition for rehearing. *See American Train Dispatchers Ass'n v. CSX Transp., Inc.*, Fin.Doc. No. 28905 (Sub–No. 24) (served Nov. 19, 1990), and the court dismissed as premature the Union's subse-

quent petition for review of the Commission's orders to arbitrate because the orders were non-final. *See American Train Dispatchers Ass'n v. ICC*, 949 F.2d 413 (D.C.Cir.1991).

**3.** The arbitral panel focused on the representative claims of a single dispatcher, John P. Barr, with the intention that resolution of his claims would provide guidance to the parties with respect to similarly situated employees.

ry minimum levels." *First Order* at p. 3. It nevertheless concluded that the dispute with CSX was appropriate for initial arbitration because it involved individual claims about "the calculation of individual benefits," where an arbitrator's expertise would be valuable. *Id.* at pp. 3–4. The Commission noted that the opportunity for Commission review would ensure consistency with *New York Dock*.

The Union does not suggest that the order to arbitrate is inconsistent with the statute or *New York Dock*.[4] Rather, the Union contends that the Commission's decision conflicts with agency policy to take initial jurisdiction over questions concerning "compensation guarantees" under labor protective conditions. The Union relies on *Great N. Pac.—Merger—Great N.,* Fin.Doc. No. 21478 (Sub-No. 6) (served Dec. 11, 1986 & April 5, 1988) ("*Landis* "), *aff'd sub nom. Landis v. Burlington N. R.R. Co.,* 930 F.2d 748 (9th Cir. 1991). *Landis* involved a claim that the carrier miscalculated a dismissal allowance provided under labor protective conditions analogous to the *New York Dock* conditions. On referral from a federal district court where the employee had initially filed suit, the Commission resolved the dispute without remitting it for arbitration, notwithstanding the fact that the conditions provided for an arbitral remedy. The Union maintains that the instant case also involves a "compensation guarantee" under labor protective conditions, and that the Commission therefore acted inconsistently when it declined to exercise initial jurisdiction.[5]

■ The apparent conflict with *Landis* thus raises the question whether the Commission adequately explained its departure from prior practice. *See King Broadcasting Co. v. FCC,* 860 F.2d 465, 469–71 (D.C.Cir.

1988); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970); *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971); *International Bhd. of Elec. Workers v. ICC,* 862 F.2d 330, 339 (D.C.Cir.1988). In the order denying the Union's petition for rehearing, the Commission recognized the *Landis* precedent and provided reasons for its departure from that policy. *See American Train Dispatchers Ass'n v. CSX Transp., Inc.,* Fin.Doc. No. 28905 (Sub-No. 24) (served Nov. 19, 1990) ("*Second Order* "). Most significantly, the Commission noted that *Landis* predated the establishment of its judicially approved policy to refer disputes to initial arbitration prior to Commission review.[6] *Id.* at p. 2. The Commission first announced its authority to review arbitral decisions in *Chicago & North W. Transp. Co.—Abandonment,* 3 I.C.C.2d 729 (1987) ("*Lace Curtain* "), *aff'd sub nom. International Bhd. of Elec. Workers v. ICC,* 862 F.2d 330 (D.C.Cir.1988). Prior to *Lace Curtain,* the Commission's jurisdiction to review an arbitration award had not been tested. Once approved by the court, *Lace Curtain* paved the way for more expansive use of arbitration than had been considered at the time *Landis* was decided. *See St. Louis Southwestern Ry.,* Fin.Doc. No. 28799, at p. 4 (Sub-No. 1) (May 23, 1991) (noting that "recent Commission practice is to permit an arbitrator to decide all issues, including issues that arguably could be decided by the Commission in the first instance") (citing decisions). The Commission's reliance on this change in law regarding its use of arbitrators provides the requisite reasoned explanation of its departure from the approach adopted in *Landis,* and we thus find no error in the Commission's decision to require arbitration here.

---

4. The court has previously observed that "[n]othing in the [ICA] either requires or forecloses the agency's use of arbitration in employee disputes." *International Bhd. of Elec. Workers v. ICC,* 862 F.2d 330, 336 (D.C.Cir.1988). Moreover, *New York Dock* provides for arbitration "with respect to the interpretation, application or enforcement of any provision" of the labor protective conditions. Art. I, § 11(b), 360 I.C.C. at 88.

5. The fact that the Commission characterized the Union's complaint as one seeking the resolution of claims rather than a dispute concerning a compensation or statutory minimum guarantee has no bearing on our disposition.

6. The Commission also observed that because *Landis* was decided on referral from a federal district court, which had stayed its own proceedings pending ICC resolution of that issue, referral to an arbitrator "would not have been appropriate." *Id.* at p. 2.

### III.

The Union also contends that the Commission's interpretation of Article I, § 5(a) of *New York Dock* is arbitrary and capricious because it conflicts with the plain meaning of the term "total compensation." In the *Third Order*, the Commission agreed with the arbitration panel's decision that the overall purpose of the protective conditions foreclosed a literal reading of the displacement allowance provision. In the view of the Commission, the conditions were designed to protect employees "only against those losses that are caused by the transaction," such that the proper construction of "total compensation" necessarily excludes extraordinary earnings that would not exist but for the transaction. *Third Order*, 9 I.C.C.2d at 1134. The Commission explained that "[t]he loss of transaction-related overtime, whether voluntary or compulsory, is not a protected harm, because it is not within an employee's normal earnings expectations."[7] *Id.* at 1135.

#### A.

■■■ Our review of the Commission's order is limited: the court will overturn a decision of the Commission only if its findings or conclusions are arbitrary, capricious, or otherwise not in accordance with law. *See* 5 U.S.C. § 706; *United Transp. Union v. United States*, 905 F.2d 463, 467–68 (D.C.Cir. 1990). The parties disagree, however, about the proper level of deference owed to the Commission's order. The Commission maintains that its decision reflects a reasonable construction of its own labor conditions and thus deserves judicial deference. As a general matter, an "agency's construction of its own regulations is entitled to substantial deference" by a reviewing court. *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). The Union

maintains, however, that *New York Dock* simply restates the pre-existing labor standards that Congress incorporated by reference in 1976 when it amended § 11347. Thus, the Union contends that the *New York Dock* conditions should be treated as a "statutory command" and the agency's discretion to interpret them should be limited accordingly. We are unpersuaded by this argument.

As the Union notes, the provision now codified as § 11347 refers to extrinsic labor-protective conditions that existed at the time Congress amended the ICA in 1976.[8] Section 11347 provides:

> When a rail carrier is involved in a transaction for which approval is sought ... the [ICC] shall require the carrier to provide a fair arrangement at least as protective of the interests of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565)....

49 U.S.C. § 11347 (1988). The statute thus incorporates by reference two sets of conditions. The first set is defined as "the terms imposed under this section before February 5, 1976," and refers to various labor-protective conditions that the Commission had imposed beginning in 1944. These were modeled after the Washington Job Protection Agreement of 1936 ("WJPA"), a private agreement between most of the nation's railroads and railroad unions. *See, e.g., American Train Dispatchers Ass'n v. ICC*, 26 F.3d 1157, 1159–60 (D.C.Cir.1994); *Railway Labor Exec. Ass'n*, 987 F.2d at 813. The second set of conditions, defined as the "terms established under section 405 of the Rail Passenger Service Act," refers to the so-

---

7. Although the Union has renewed its objections to the use of Mr. Barr's claim as a representative example and to the method used by CSX to factor out the employees' transaction-related earnings, the Commission could reasonably affirm these aspects of the arbitral decision. Hence we focus, as did the Commission, on the general principle concerning the exclusion of transaction-related overtime from "total compensation" used to compute the "average monthly compensation" figure in *New York Dock* § 5(a).

8. The ICA provision currently codified at 49 U.S.C. § 11347 was formerly located at 49 U.S.C. § 5(2)(f). Originally enacted in the Transportation Act of 1940, § 5(2)(f) was amended by the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, § 402(a), 90 Stat. 31, 62. *See generally New York Dock Ry.*, 609 F.2d at 90.

called "Appendix C–1" conditions, which were adopted in 1971 by the Secretary of Labor to comply with the Rail Passenger Service Act of 1970.[9] With certain differences not material here, both the WJPA (and its progeny) and the Appendix C–1 conditions provide for a displacement allowance analogous to that in *New York Dock*; the formula used to calculate the test period average is functionally identical in each instance.[10]

Although this brief history helps explain the origin of *New York Dock*, it does not support the Union's contention that *New York Dock* must be treated as a statute for purposes of determining the appropriate scope of review of the Commission's order. The Commission itself crafted the *New York Dock* conditions pursuant to authority granted by Congress, and it is apparent that Congress intended to delegate that authority subject only to a floor of protection as defined by reference to the antecedent conditions. *See New York Dock Ry.*, 609 F.2d at 86–95; *see also Railway Labor Exec. Ass'n v. United States*, 339 U.S. 142, 155, 70 S.Ct. 530, 536–37, 94 L.Ed. 721 (1950); *Railway Labor Exec. Ass'n v. United States*, 675 F.2d 1248, 1254–56 (D.C.Cir.1982). The structure of § 11347, by referring to standards "at least as protective of" those extrinsic conditions, contains within it a broad measure of discretion with respect to the actual formulation of the protective conditions. Moreover, the interpretation and application of labor-protective conditions—conditions "which the Commission itself has the first responsibility to formulate and announce"—falls "within the Commission's particular area of concern and expertise." *See Stinson v. United States*, —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993). Because there is no suggestion that the Commission's interpretation is contrary to § 11347 (which is silent on the proper calculation of displacement allowances), we therefore review the

*Third Order* with the deference applicable when an agency interprets its own orders. Under this standard, the court will defer to the Commission's interpretation where "the meaning of [regulatory] language is not free from doubt" so long as "the interpretation sensibly conforms to the purpose and wording of the regulations." *Martin v. OSHRC*, 499 U.S. 144, 150–51, 111 S.Ct. 1171, 1175–76, 113 L.Ed.2d 117 (1991) (internal citations and quotation marks omitted); *see also Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1299–1300 (D.C.Cir.1992) (quoting *Puerto Rico Elec. Power Auth. v. FERC*, 848 F.2d 243, 249 (D.C.Cir.1988)); *Secretary of Labor v. Western Fuels–Utah, Inc.*, 900 F.2d 318, 321 (D.C.Cir.1990) (quoting *Southern Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 526 (D.C.Cir.1977)).

**B.**

■ Because a court may defer to an agency interpretation only where the meaning of the term is doubtful or ambiguous, *see Pfizer, Inc. v. Heckler*, 735 F.2d 1502, 1509 (D.C.Cir.1984), we begin our review with the language of § 5(a). Section 5(a) provides that:

> [e]ach displaced employee's displacement allowance shall be determined by dividing separately by 12 the *total compensation* received by the employee and the total time for which he [or she] was paid during the last 12 months in which he [or she] performed services immediately preceding the date of his [or her] displacement as a result of the transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). . . .

*Id.* (emphasis added). On its face, the formula set forth in § 5(a) appears clear: the displacement allowance shall be calculated by

---

9. The Appendix C–1 conditions apply to certain transactions covered under the "Amtrack Act." *See* Rail Passenger Service Act of 1970, Pub.L. No. 91–518, § 405, 84 Stat. 1327, 1337 (codified at 45 U.S.C. § 565) (requiring labor protective conditions, including "provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to [the ICA]"); *see also New York Dock Ry.*, 609 F.2d at 88–89, 94.

10. *Compare New York Dock* § 5(a) *with* Appendix C–1 § 5(a) *and* WJPA § 6(c).

reference to "total time" worked and "total compensation" received over the twelve month test period. The language suggests that all earnings, including payments for overtime performed in connection with the consolidation, would be included in calculating the test period average and thereby used as a baseline to determine the employee's compensation throughout the six-year protected period. Viewed in isolation, therefore, this provision would appear to admit of little or no ambiguity.[11]

■ Yet when viewed in the context of the overall scheme of *New York Dock*, the displacement formula's meaning is at variance with the literal interpretation. As the Supreme Court has admonished in the statutory context, that background cannot simply be ignored:

> To take a few words from their context and with them thus isolated to attempt to determine their meaning, certainly would not contribute greatly to the discovery of the purpose of the draftsmen of a statute, particularly in a law drawn to meet many needs of a major occupation.

*United States v. American Trucking Ass'ns, Inc.*, 310 U.S. 534, 542–43, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940); *see also McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991) ("[S]tatutory language must always be read in its proper context."). It is therefore appropriate for the court to extend its inquiry beyond the immediate text of § 5(a) to discern whether the literal interpretation urged by the Union makes sense in the context of the labor-protective conditions as a whole. *See American Scholastic TV Programming Found. v. FCC,* 46 F.3d 1173, 1178 (D.C.Cir. 1995) ("*ASTV*"); *see also Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) ("Where the literal reading of a statutory [or regulatory] term would compel an odd result, we must search for other evidence of congressional [or regulatory] intent to lend the term its proper scope.") (internal quotation marks and citations omitted); *Tataranowicz v. Sullivan,* 959 F.2d 268, 275–80 (D.C.Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 963, 122 L.Ed.2d 120 (1993).

In *ASTV,* the court employed the traditional *Chevron* two-step framework to uphold the Federal Communication Commission's interpretation of a statute prohibiting telephone companies from providing video programming. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). While acknowledging that the specific language suggested "a blanket prohibition of *all* video programming, whether transmitted by cable or not," the court nevertheless proceeded to examine the " 'language and design of the statute as a whole.' " *ASTV,* 46 F.3d at 1178 (quoting *Fort Stewart Schools v. FLRA,* 495 U.S. 641, 645, 110 S.Ct. 2043, 2046, 109 L.Ed.2d 659 (1990)). With its inquiry thus broadened, the court determined that "Congress meant only to reach video programming via cable," and that this determination thereby rendered the term "video programming" ambiguous, at least with respect to the intended scope of the video programming bar. *Id.* at 1179. The court then deferred to the agency's otherwise reasonable interpretation.[12] We adopt a similar framework of analysis here, with the added observation that our deference to the agency's judgment is enhanced in the regulatory context.

As in *ASTV,* the design of *New York Dock* as a whole renders ambiguous the intended reach of the displacement allowance as it applies to transaction-related overtime. Particularly in tension are the sweeping reference to "total compensation" in § 5(a) and the narrow definition of a "displaced employ-

11. *But cf. Cardillo v. Liberty Mut. Ins. Co.,* 101 F.2d 254, 255 (D.C.Cir.1938) (interpreting the term "total compensation," as used in the D.C. Employees' Compensation Act, to exclude medical and similar benefits that the employer is required to furnish).

12. For other cases in which courts have found ambiguity where the literal reading of a facially clear provision would conflict with the statutory design, regulatory scheme or underlying object and policy, see *McCarthy v. Bronson,* 500 U.S. at 139, 111 S.Ct. at 1740; *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 23–24, 96 S.Ct. 1938, 1948–49, 48 L.Ed.2d 434 (1976); *Tataranowicz,* 959 F.2d at 276–280.

ee" in § 1(b). Interpreted literally, § 5(a) would permit an employee to benefit—for the duration of the protected period—from temporary and abnormal pay fluctuations stemming directly from the transaction itself. By contrast, § 1(b) indicates a very different purpose behind the conditions. That section provides that:

> "Displaced employee" means an employee of the railroad who, as a result of the transaction is placed in a worse position with respect to his compensation and rules governing his working conditions.

*New York Dock,* Art. I, § 1(b); 360 I.C.C. at 84. Section 1(b) thus reflects an intention underlying the conditions to ensure that employees are no worse off (at least during the protected period) after a consolidation than they would be *had the consolidation never taken place.* It is difficult to see how this purpose could be harmonized with the displacement allowance if § 5(a) were given literal effect. In the words of the Commission, "[a]n employee does not lose, 'as a result of the transaction,' that which he would never have had but for the transaction." *Third Order,* 9 I.C.C.2d at 1134. Despite the facially plain language of § 5(a), therefore, we conclude that the scope of the compensation allowance is ambiguous in light of the conflict with § 1(b).

In addition, we conclude that the exclusion of transaction-related overtime reasonably comports with the context and purpose of the conditions as a whole. Neither the regulatory scheme nor the history of *New York Dock* suggests that a six-year windfall is consistent with the purposes of the labor conditions. Indeed, § 5(a) itself indicates that the displacement allowance was not intended to confer a windfall on affected employees. After setting forth the allowance formula, that section provides that a displaced employee who "works in any month in excess of" his test period average hours shall be paid for those excess hours only at the rate he would normally receive in his retained position. *New York Dock,* Art. I, § 5(a), 360 I.C.C. at 86. This provision prevents an employee from leveraging his displacement allowance into a bonus wage, an effect that comports with the Commission's view of the displacement allow-

ance. Together with § 1(b), § 5(a) thus further demonstrates that the protective conditions aim only at mitigating the hardship that certain employees would suffer as a result of a railroad consolidation. The "plain language" interpretation of § 5(a) urged by the Union would therefore violate the principle that a regulatory interpretation must be, among other things, consistent with the regulatory scheme. *See Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America, Inc.,* 423 U.S. 12, 15, 96 S.Ct. 172, 173–74, 46 L.Ed.2d 156 (1975).

The historical origins of railroad labor conditions also point up the dissonance between the literal meaning of § 5(a) and the purpose of *New York Dock* as a whole. As noted, *New York Dock* descends from a long line of antecedents—voluntary agreements, statutory mandates, and Commission-drafted conditions—each designed to protect railroad workers from the consequences of mergers and consolidations in the railway industry. Historically these protections were intended to cushion workers from dislocations stemming from certain railroad transactions. The essence of the protective provisions has consistently contemplated a causal relationship between compensatory benefits and economic harms resulting directly from the transaction. The function of displacement allowances in these schemes was to equalize, for a specified duration of time, a shortfall in an employee's earnings caused by a move to a less remunerative position as a result of the consolidation. Nothing in the legislative or administrative precursors to *New York Dock* suggests an intent to preserve, for the length of the protected period, abnormal or extraordinary temporary increased earnings that are an incident of the transaction itself.

Congress expressed this intent to preserve only the pre-transaction compensation status quo as early as 1933, when it passed the Emergency Railroad Transportation Act, 48 Stat. 211, 214, an act that "contemplated extensive railroad consolidations." *Brotherhood of Maintenance of Way Employes v. United States,* 366 U.S. 169, 173, 81 S.Ct. 913, 915, 6 L.Ed.2d 206 (1961). That tempo-

rary statute provided for employee protection against losses *caused by the transaction:*

> Nor shall any employee ... be in a worse position with respect to his compensation for such employment, by reason of any action taken pursuant to the authority conferred by this title.

In 1936, prior to the expiration of the Emergency Act, the railroads and unions negotiated the WJPA, § 1 of which states that its benefits "are to be restricted to those changes in employment in the Railroad Industry solely due to and resulting from [railroad] coordination." Among other compensatory provisions, § 6 of the WJPA provided that "[n]o employee ... who is continued in service shall ... be placed, as a result of such coordination, in a worse position with respect to compensation and rules governing working conditions than he occupied at the time of such coordination...." Still later, in 1940 Congress enacted § 5(2)(f) of the ICA, which required the Commission to include conditions providing that "such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment." [13] 49 U.S.C. § 5(2)(f) (1976).

Nor do the conditions from which *New York Dock* is directly derived—namely, the Commission's practice pursuant to ICA § 5(2)(f), as enhanced by the Amtrack Act's Appendix C–1 conditions—reflect anything other than an intention to protect employees from economic harm stemming from the transaction. In *Southern Ry.—Control—Central of Ga. Ry.,* 317 I.C.C. 729, 730–31 (1963), the Commission stated that "[b]efore an employee is entitled to such benefits, there must be a reasonably direct causal connection between the transaction and the injury sustained." *See also Southern Ry.—Control—Central of Ga. Ry.,* 317 I.C.C. 557, 568 (1962) ("Both the statute and the condition mean what is literally stated; i.e., that

an employee is protected against adverse effects suffered in his employment as a result of the transaction."). The Amtrack Act specified that the protective arrangements must include provisions necessary for "the protection of such individual employees against a worsening of their positions with respect to their employment." 45 U.S.C. § 565(b). Underlying each of these predecessor schemes, therefore, was a consistent intention to maintain an employee's normal earnings at the level prior to the railroad consolidation. To establish that baseline by reference to abnormal earnings traceable to the transaction rather than the employee's "normal" pre-transaction employment, as the literal interpretation of *New York Dock* would do, conflicts with the history and practical context against which *New York Dock* was crafted and must be understood.

To date, moreover, most arbitrators have adopted a construction consistent with that taken in the instant case. Both the Commission and the arbitral panel here relied in part on a line of arbitration decisions, extending back to the WJPA of 1936, that found transaction-related earnings excludable from the displacement allowance formula. This interpretive background supports the reasonableness of the Commission's interpretation in two ways: first, it shows that the Commission's present interpretation is consistent with the way in which the terms imposed under the WJPA had been generally construed when Congress amended § 11347 and when the Commission formulated *New York Dock.* [14] Second, it demonstrates that the facially clear terms used in § 5(a) had a generally accepted meaning as a matter of industry practice and custom at least by the time that the parties entered into the 1988 Implementing Agreement.

In their submissions to the arbitration panel and the Commission, the parties identified three relevant arbitration decisions dating to

**13.** *See Brotherhood of Maintenance of Way Employes,* 366 U.S. at 176 n. 7, 81 S.Ct. at 916–17 n. 7 (citing floor comments of House conferee just prior to House vote on § 5(2)(f), assenting to statement that the term "worse position" means that "[the employee's] compensation will be just the same for a period of 4 years, assuming that

he were employed for 4 years, as it would if no consolidation were effected").

**14.** The parties have identified no pre–1976 arbitral awards interpreting the displacement allowance formula set forth in the Appendix C–1 conditions.

the pre–1976 period before Congress amended the ICA. In two cases arising under the WJPA, Referee Bernstein ruled that the displacement allowance did not contemplate compensation for extraordinary transaction-related overtime during the test period. *See Brotherhood of Ry. & Steamship Clerks v. Chesapeake & Ohio Ry. Co.*, WJPA Docket No. 62 (undated) (applying a causation principle to a 1954 coordination agreement) (*reproduced at* Joint Appendix 77–80); *Transportation–Comm. Employees' Union v. Georgia R.R.*, WJPA Docket No. 137 (undated) ("the [1962] Agreement is designed to protect employees against reduction of their normal earnings") (*reproduced at* Joint Appendix 73–76). In contrast, the Union points to a 1964 decision by Arbitrator Robertson that required the carrier to comply with the literal terms of the allowance formula. *Brotherhood of Ry. and Steamship Clerks v. Western Md. Ry. Co.*, Arb.Board No. 284 (Sept. 9, 1964) (*reproduced at* Brief for Petitioner, Addendum 1c). Although the Robertson award suggested that transaction-related overtime would fall within the terms of the displacement compensation, the Commission properly concluded that the decision is inapposite because the underlying dispute concerned overtime earnings caused by illness or vacation absences of co-workers, not overtime resulting from the transaction. Be-

cause the relevant arbitration awards prior to the adoption of the *New York Dock* conditions excluded transaction-related overtime, it can be reasonably inferred that this was the interpretation of "total compensation" adopted by the Commission when it formulated the *New York Dock* conditions.

The post-*New York Dock* arbitral interpretations submitted to the Commission have, with one exception, reaffirmed the earlier construction of the displacement formula.[15] In four separate awards, chaired by two different arbitrators, the panels determined that including transaction-related overtime in the test period average would result in an unintended windfall for affected employees. In the only relevant exception identified by the Union, the arbitral panel adhered stringently to the text of the test period formula without considering the context of the protective conditions.[16] *International Bhd. of Elec. Workers v. Burlington N. R.R. Co.* (Willits, Neutral Member) (October 10, 1991) (Appendix C–1 conditions) (*reproduced at* Brief for Petitioner Addendum 6c).

▪ Notwithstanding this 1991 arbitral decision, which issued after CSX and the Union had agreed to incorporate the *New York Dock* conditions into their 1988 Implementing Agreement, the Commission's inter-

---

**15.** *See Brotherhood of Ry. Carmen v. Burlington N. R.R.* (LaRocco, Neutral Member) (Dec. 17, 1990) (Appendix C–1 conditions) (noting that while issue of whether various types of overtime fall within "total compensation" has been arbitrated frequently with different results, the "most recent line of arbitral authority excluded overtime earnings attributable to an imminent transaction from an employee's total test period earnings") (*reproduced at* Arbitration Record Addendum 6, Exhibit OO); *Transportation–Comm. Int'l Union v. Missouri Pacific R.R. Co.* (LaRocco, Neutral Member) (March 1, 1988) (*New York Dock* conditions) ("While test period average earnings cannot be computed solely with straight time earnings, the term 'total compensation' in protective agreements like the New York Dock Conditions has evolved over the years into a meaning slightly at variance with the literal language.... [E]xcessive overtime earnings directly attributable to the imminent coordination are outside the ambit of total compensation. The exception is narrow. The Carrier bears the heavy burden of proving that the overtime was extraordinary and linked directly to the impending implementation of the transaction.... The

narrow exception ... is designed to prevent employees from profiting from the transaction.") (*reproduced at* Joint Appendix 36, 47–48); *ATDA v. Burlington N. R.R. Co.* (LaRocco, Neutral Member) (Jan. 9, 1987) (1966 National agreement) (*reproduced at* Arbitration Record, Addendum 6, Exhibit QQ); *ATDA v. Baltimore & Ohio R.R. Co.*, Arb.Board No. 409 (Lieberman, Neutral Member) (May 6, 1982) (finding "no basis for perpetuating the abnormal and truly windfall overtime earnings which the three claimants accrued during the six-month period immediately preceding the coordination for a five year period") (*reproduced at* Joint Appendix 53, 62).

**16.** The Union also cites a 1990 arbitral decision interpreting § 5(a) of *New York Dock*, which ruled that the test period average formula must be construed according to its literal terms. *International Bhd. of Elec. Workers v. CSX Transp., Inc.*, (Fletcher, Neutral Member) (Oct. 3, 1990) (*reprinted at* Union Br.Addend. 23c). As with the 1964 decision by Arbitrator Robertson, however, this decision is inapposite because it concerns the inclusion of non-protected wage earnings, rather than transaction-related overtime.

pretation is consistent with the weight of arbitral precedent, lending further support to the reasonableness of its decision. Arbitration decisions reflect the industry's practice, usage and custom—factors properly considered in examining the context in which conditions' terms should be interpreted. In addition to their influence on the drafters of *New York Dock*, the arbitral interpretations have presumably affected the parties' understanding about the meaning of the conditions as they apply in practice. As such, they substantially mitigate any potential inequity associated with a regulatory construction at variance with the plain meaning of § 5(a). *Cf. Secretary of Labor v. Western Fuels–Utah, Inc.,* 900 F.2d 318, 326–27 (D.C.Cir. 1990) (Edwards, J., dissenting) (in regulatory interpretation, the plain meaning rule gives effect to basic principles of notice). This is particularly true in the instant case, where the Union was a party in two of the arbitration awards rejecting the Union's interpretation of § 5(a), both of which issued prior to the 1988 Implementing Agreement. *See ATDA v. Burlington N. R.R. Co.* (LaRocco, Neutral Member) (Jan. 9, 1987); *ATDA v. Baltimore & Ohio R.R. Co.,* Arb.Board No. 409 (Lieberman, Neutral Member) (May 6, 1982). At a minimum, these decisions put the Union on notice that § 5(a) of *New York Dock* might be interpreted to exclude transaction-related overtime; yet nothing in the record suggests, and the Union has not argued to the court, that the Union sought to clarify the scope of § 5(a) when it agreed to the Implementing Agreement, which incorporated *New York Dock.*[17]

For these reasons, upon consideration of the design and purpose of the *New York Dock* conditions as a whole, as well as industry practice reflected in the arbitral awards, we are unpersuaded by the Union's reliance on the plain language of § 5(a). Because the Union has provided no other persuasive reason why the court should not defer to the Commission's interpretation of its own conditions, we deny the petition for review.

WALD, Circuit Judge, dissenting in part:

Normally, we give great deference to an agency's interpretation of its own regulations. *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986). But deference is not due when the agency's interpretation flatly contradicts the only sensible reading of an unambiguous regulation. *Thomas Jefferson University v. Shalala,* —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (agency's interpretation of its own regulation is not controlling if "plainly erroneous" or "inconsistent with the regulation"). Unlike the majority, I cannot find the term "total compensation" as used in Article I, § 5(a) of the *New York Dock* conditions at all ambiguous, and I would not defer to what seems to me a most extraordinary and implausible construction of the Commission's which cannot be justified in result any more than in rhetoric.[1]

Section 5(a) of the *New York Dock* conditions sets out a clear and straightforward fixed formula for calculating an employee's displacement allowance, based on her earn-

---

**17.** Partly for this reason, the Union's remaining argument based on "fundamental fairness" fares no better. It may be "fair" to permit employees to share in the economies created by a railroad consolidation, particularly where their mandatory overtime helps the transaction succeed. But the Union offered no evidence to suggest that either Congress, the Commission, or the drafters of the WJPA and their successors intended to go beyond the goal of protecting employees from being in a worse employment position as a result of a consolidation.

**1.** I agree with the majority that the *New York Dock* conditions are not a statute and therefore ordinary standards of statutory interpretation do not apply. *See* Majority opinion ("Maj. op.") at 847–48. Here, however, the Commission af-

firmed the arbitrator's award on the basis of an interpretation of its own regulation that, in my view, is "plainly erroneous" and squarely "inconsistent with the regulation" itself, and therefore not entitled to our deference. *See Thomas Jefferson University,* —— U.S. at ——, 114 S.Ct. at 2386; *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). *See also Gardebring v. Jenkins,* 485 U.S. 415, 430, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988) (agency's interpretation of its own regulation is entitled to deference "unless ... [an] alternative reading is compelled by the regulation's plain language").

ings in a twelve month "test period" immediately prior to displacement:

> Each displaced employee's displacement allowance shall be determined by dividing separately by 12 the *total compensation* received by the employee and the *total time* for which he was paid during the last *12 months* in which he performed services immediately preceding the date of his displacement as a result of the transaction (thereby producing average monthly compensation and average monthly time paid for in the test period). . . .

*New York Dock,* Art. I, § 5(a), 360 I.C.C. 60, 86 (1979) (emphasis added), *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979).

The formula works like this: Begin with the date of the employee's displacement, and use the preceding twelve months as the "test period." To determine "average monthly compensation," take the employee's *total* compensation received during the 12–month test period, and divide by 12. Similarly, to determine "average monthly time paid for," take the *total* time for which the employee was paid during the 12–month test period, and divide by 12. It is hard to find anything ambiguous there; ordinary terms like "total compensation," "total time," and "12 months," coupled with elementary arithmetic, produce a predictable amount in all cases.

Like any fixed formula for calculating benefits based on time worked, this one may in some few cases produce arguably overly generous or not generous enough results. Although its *purpose* is to establish a benchmark of "normal" earnings, so as to determine how much an employee has lost from the displacement, the formula makes no adjustment for unusual factors which might make the specified 12–month test period unrepresentative for a given employee. So, for example, an employee who had previously worked twenty years without missing a day, but who is forced to take an unpaid leave during the test period due to illness or family circumstances, will end up with lower "total compensation," lower "average monthly compensation," and ultimately lower displacement benefits than one might expect based on her historical "normal" earnings. No ad-

justment is made for that unfortunate happenstance, even though it might be said that the employer is getting an unjust "windfall" and the employee is suffering an unjust loss.

Similarly, an employee who works an unusually large (or unusually small) amount of overtime during the 12–month test period will end up with "total compensation," "average monthly compensation," and displacement benefits at variance with his historical "normal" earnings. In such cases the "windfall" can shift in either direction depending upon whether earnings are abnormally high or abnormally low in the test period. Though this kind of formula may sometimes produce aberrant results in individual cases, it is nevertheless widely used for its compensating virtues of objectivity, uniformity, certainty, and easy administrability.

Despite the lucidity of the formula and its acknowledged potential in some cases for producing atypical results, in either the employer's or employee's direction, it is argued that we should engage in its extensive reconstruction when a "literal" application would work against the employer's interests. In such cases, the Commission and the majority say, "total compensation" should be construed not to mean *total* compensation as that term is ordinarily understood (*i.e., all* the compensation an employee receives in the specified period), but instead something akin to "all the compensation the employee receives in the test period, except compensation for any hours in excess of the employee's 'normal' hours." "Normal" hours are not to be determined solely by reference to the 12–month "test period" specified in the § 5(a) formula; instead, a second, 8–month measuring period prior to the "transaction" is used as the norm. Any hours in the 12–month "test period" in excess of the employee's "normal" hours as determined from this 8–month measuring period, nowhere mentioned in § 5(a), are presumed to be "transaction-related," and are deducted from the employee's "average monthly hours worked." That second figure, multiplied by the employee's base rate of pay during the 12–month test period, becomes the new "average monthly compensation," and the basis upon which the employee's displacement benefits are calcu-

lated. *See American Train Dispatchers Ass'n v. CSX Transportation, Inc.,* 9 I.C.C.2d 1127, 1129 & n. 6 (1993) (describing methodology).

Whatever other merits or demerits this methodology may have, it certainly does not derive from anything in the language of § 5(a). Indeed, I am hard pressed to see how this new construction can conceivably qualify as a plausible reading of that provision. This is not a case where the term "total compensation" in § 5(a) can bear two plausible meanings, and the Commission has adopted the less obvious one. Rather, the objective formula for calculating displacement benefits so plainly prescribed by § 5(a) is 90% discarded, and an almost totally new methodology substituted in its stead. Under such extreme circumstances, I do not think the Commission's approach can be fairly said to "interpret," much less to "draw its essence from" § 5(a) or the *New York Dock* conditions generally, *Chicago & North W. Transp. Co.—Abandonment,* 3 I.C.C.2d 729, 735 (1987) ("*Lace Curtain*"), *aff'd sub nom. International Broth. of Elec. Workers v. ICC,* 862 F.2d 330 (D.C.Cir.1988).

The majority insists, however, that § 5(a) is ambiguous in light of the "design of *New York Dock* as a whole." Maj. op. at 849. In particular, the majority relies on the "narrow definition" of "displaced employee" in § 1(b) as "an employee ... who, as a result of the transaction is placed in a worse position with respect to his compensation and rules governing his working conditions," *New York Dock,* Art. I, § 1(b), 360 I.C.C. at 84. The majority says this "reflects an intention underlying the conditions to ensure that employees are no worse off (at least during the protected period) after a consolidation than they would be *had the consolidation never taken place.*" Maj. op. at 850 (emphasis in original).

This "narrow definition" of a displaced employee, however, is designed only to identify the class of employees eligible for displacement benefits—those injured, *i.e.,* "placed in a worse position" or made "worse off" as a result of the employer's transaction over a six-year period. There is no question that the dispatchers whose jobs were lost or downgraded by CXT's consolidation were "placed in a worse position," and therefore qualify for benefits, however we interpret § 5(a). The § 5(a) formula itself is designed to measure the benefits to which these "displaced" employees are entitled—not to determine whether they are "displaced" and qualify for benefits at all. It is like mixing apples and oranges to use the definition of who is a "displaced employee" and can receive benefits to narrow the plain language of how to calculate the benefits due to such a person. Although § 1(b) reflects a general purpose behind the *New York Dock* conditions—to assist "displaced employees" by providing them with displacement benefits—it says nothing about how *much* assistance these employees should receive[2]; that amount is plainly set out in the formula in § 5(a). I can, in short, find no inconsistency or even tension between § 1(b) and § 5(a), certainly nothing sufficient to render the plain language of § 5(a) ambiguous.

When a provision of law defines an injury and provides that members of the injured class are entitled to compensation, it may be intuitive to expect that the compensation should be commensurate with the injury. But when as here, for other reasons such as predictability, administrability, certainty, etc., a separate provision specifies in plain and unambiguous terms an across-the-board formula for calculating the benefits members of the injured class are to receive, the terms of the benefits provision, not our intuitions, should control.

Actually, the majority's interpretive argument proves too much. Certainly it is true, as the majority argues, that the *New York Dock* conditions were not intended to produce "windfalls" for employees—or, we may

---

**2.** Indeed, if § 1(b) did carry any implications relevant to the measure of benefits, I would read it as setting a *floor* rather than a ceiling on benefits; after all, its concern is that employees not be placed in a *worse* position during the protected period.

add, for employers either. But if the majority's reasoning is sufficient to justify overriding a "literal" application of § 5(a) in this case, I do not see any principled ground on which to deny an override of § 5(a) anytime a "windfall" comes the way of either the employer or the employee. And that, of course, would defeat the purpose of the § 5(a) formula entirely, leaving the Commission with discretion in every individual case to decide whether or not the prescribed 12–month test period is truly representative of the employee's "normal" earnings, or whether § 5(a) should be overridden by some other "fairer" methodology unique to the facts of that case. Such a result is surely contrary to the purposes of *New York Dock*, which patently seeks to prescribe a uniform, objective formula for determining displacement benefits. For instance, under the majority's reasoning, these provisions were no more *intended* to give a "windfall" to an employee who has abnormally large overtime earnings during the test period for reasons *unrelated* to the transaction causing her displacement—for example, an unexpected spike in business during the test year, or an unusual and temporary shortage of co-workers—than to one who has *transaction-related* overtime. I can foretell no grounds on which to distinguish between transaction-related and unrelated overtime, since *any* overtime earnings above a historical average would give the employee a six-year "windfall" arguably inconsistent with the purposes of *New York Dock*. Indeed, one might think it more un-

just—and farther from the purposes of the *New York Dock* conditions—to reward employees with "windfalls" for extraordinary overtime *unrelated* to the transaction, since such circumstances are presumably more difficult for the employer to foresee and control than transaction-related overtime in a 12–month test period immediately prior to the employee's displacement.[3]

It seems equally certain that the *New York Dock* conditions were not *intended* to disadvantage an employee who, through no fault of her own, has abnormally *low* earnings during the 12–month test period, thus giving her employer a "windfall" by reducing her displacement benefits. Indeed, an employee who loses expected earnings in the "test year" may be banking on making up the loss in subsequent years, and therefore may be doubly "worse off" when the inflexibility inherent in the § 5(a) formula cuts short her displacement benefits. This result, too, may be the unintended and arguably unjust consequence of a "literal" application of the *New York Dock* formula. It is just as arguably inconsistent with the "context and purpose" of the regulatory scheme which aims to protect an employee's "normal" earnings as the majority thinks the present case. But no one suggests a reconstruction of the § 5(a) formula in these cases.

In sum, I find § 5(a) totally unambiguous, but acknowledge it is not without warts. Indeed, some might go so far as to conclude the drafters of the *New York Dock* conditions

---

3. The Commission relies on the rationale that it would be unjust to allow employees to reap a "windfall" from *transaction-related* overtime during the 12–month test period, but in actual operation the methodology used here makes no distinction between transaction-related and unrelated overtime. *Any* overtime in the 12–month test period in excess of the employee's "normal" earnings in an 8–month measuring period prior to the transaction is deleted from that employee's "total compensation" for purposes of calculating displacement benefits. *See* 9 I.C.C.2d at 1129 n. 6, 1135. Thus if during the 12–month test period employee A is forced to work overtime due to employee B's illness, employee A's "excess" overtime will not count toward her displacement benefits; but employee B's displacement benefits will be based on her abnormally low earnings. The employer is not required to establish any

causal nexus between the transaction and the overtime. *See id.* at 1135. The Commission apparently would shift the burden to the employee to show that overtime in the test period is *not* transaction-related, but offers no explanation why the evidentiary burden should fall on the employee. *See id.* In addition, this approach invites an unraveling of the clear and objective methodology of the § 5(a) formula into a detailed, hour-by-hour, fact-based dispute over whether the overtime is, or is not, caused by or "related to" the transaction. I would conclude that the Commission's rationale, based solely on excluding *transaction-related* overtime, does not adequately explain the methodology actually used in this case. That alone is reason enough to reverse the Commission's action as arbitrary and capricious.

may have handed the current Commission a bad formula for calculating displacement benefits. Perhaps a different test period than the one plainly specified in § 5(a) would more fairly measure employees' "normal" earnings.[4] Perhaps it would be better to use a formula that explicitly excludes transaction-related overtime from the calculation of displacement benefits. Or perhaps a fixed 12–month test period is too short and too arbitrary in any event, and more flexible individualized methods of calculating "normal" earnings can be devised. The Commission presumably may take appropriate measures to amend or replace the offending provisions. But those measures should not include reading the current provision to say what it plainly does not say.[5]

I would conclude that Article I, § 5(a) of the *New York Dock* conditions is not ambiguous, hold that the Commission's order affirming the arbitrator's award was arbitrary and capricious, and remand to the Commission for further proceedings. Therefore, I respectfully dissent from that portion of the majority opinion affirming the award.

---

4. Underlying the Commission's approach is the idea that the 12–month test period specified in § 5(a) is defective, giving a false indication of an employee's "normal" earnings in many cases. The test period consists of the 12 months prior to the date the employer's transaction first adversely affects the individual *employee,* a period which may embrace temporary fluctuations in earnings due to transitional arrangements necessitated by the transaction itself. To remedy this perceived flaw, the Commission allowed the employer to use a second test period entirely preceding the transaction, overriding the methodology unambiguously prescribed by § 5(a). A more straight-forward solution would be to amend § 5(a) to provide for a different test period.

5. Nor am I persuaded by the history of previous arbitrators' awards interpreting § 5(a) to exclude transaction-related overtime. If § 5(a) were truly ambiguous, these prior interpretations would carry great weight. But it seems to me that previous arbitrators, like the Commission in this case, disapproved on policy grounds the results unambiguously mandated by § 5(a). I decline to join them in entertaining the fiction that § 5(a) is ambiguous.