Jack O. BLACK and Patrick W. Simmons, Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

CSX Transportation, Inc., Intervenor.

No. 85–1820.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 13, 1986.

Decided March 31, 1987.

Gordon P. MacDougall, Washington, D.C., for petitioners.

Evelyn G. Kitay, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Craig M. Keats, Deputy Associate Gen. Counsel, I.C.C., Catherine G. O'Sullivan and Andrea Limmer, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.

R. Lyle Key, Jr., Jacksonville, Fla., was on brief, for intervenor, CSX Transp., Inc.

Before EDWARDS and BORK, Circuit Judges, and SWYGERT,* Senior Circuit Judge.

Opinion PER CURIAM.

PER CURIAM:

The petitioners, officials of the United Transportation Union (UTU),[1] ask us to review orders of the Interstate Commerce Commission (the ICC) denying Missouri Pacific Railroad (MP) employees the labor-protective conditions of 49 U.S.C. § 10903(b)(2).[2] The issue of statutory labor protection arose in connection with Seaboard System Railroad, Inc.'s (Seaboard)[3] request to abandon approximately one mile of its tracks in Hammond, Indiana and its concomitant decision to reroute its Hammond traffic. This change in operations displaced MP employees who had manned Seaboard trains over the abandoned tracks. We conclude that the ICC's denial of protection to MP employees was arbitrary, capricious, and contrary to law.

I

Prior to October 1984, Seaboard served its Hammond, Indiana customers over a northerly route originating at Yard Center, Illinois. The Yard Center facilities were jointly owned by Seaboard and MP, although MP operated the facilities. Seaboard trains, operated by MP crews, traveled from Yard Center over northerly trackage owned by the Chicago and Western Indiana Railroad to a segment of Seaboard trackage in Hammond.

On October 5, 1984, Seaboard changed its routing. It began classifying its cars designated for Hammond at the Belt Railway of Chicago's Clearing Yard rather than at Yard Center. The cars now moved from Clearing Yard in a southerly direction over Grand Trunk Western Railroad trackage to Dyer, Indiana and then to Hammond. Because Seaboard had its own crews at Clearing Yard, MP employees were no longer needed for the Hammond operation.

■ In addition, because Seaboard trains now approached Hammond from the south rather than the north, it was no longer necessary for Seaboard to use approximately one mile of its trackage in downtown Hammond. On October 8, 1984, three days after the rerouting, Seaboard executed a petition[4] requesting that the ICC exempt from regulation[5] its proposed abandonment of the one-mile segment. UTU did not object to the abandonment itself, but requested that protection under 49 U.S.C. § 10903(b)(2) be extended to MP employees who had operated Seaboard trains over the segment to be abandoned.[6]

In its initial decision, the ICC granted Seaboard's exemption request, but denied

---

* Of the United States Court of Appeals for the Seventh Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. Jack O. Black is the Indiana Legislative Director for UTU; Patrick W. Simmons is the Illinois Legislative Director.

2. 49 U.S.C. § 10903(b)(2) imposes labor-protective conditions upon railroads that abandon track or discontinue service. The statute provides:

   On approval, the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under section 11347 of this title and section 405(b) of the Rail Passenger Service Act (45 U.S.C. § 565(b)).

   The customary protections accorded to employees affected by a rail line abandonment are

described in *Oregon Short Line R.R.—Abandonment—Goshen,* 360 I.C.C. 91 (1979).

3. Seaboard's corporate name has since been changed to "CSX Transportation, Inc."

4. Seaboard filed its petition with the ICC on October 16, 1984.

5. Under 49 U.S.C. § 10903, a rail line cannot be abandoned without ICC approval. However, an abandonment is exempt from regulation if (1) continued regulation is not necessary to carry out the rail transportation policy of 49 U.S.C. § 10101a and (2) either the transaction is of limited scope, or regulation is not necessary to protect shippers from abuse of market power. *See* 49 U.S.C. § 10505(a).

6. Under 49 U.S.C. § 10505(g), the ICC may not use its exemption authority to relieve a carrier of its obligation to protect the interests of employees.

protection to MP employees. (It did grant such protection to Seaboard employees.) The ICC reasoned that the October 5 rerouting rather than the proposed abandonment was the sole source of any impact on MP employees, precluding application of 49 U.S.C. § 10903(b)(2).[7] UTU petitioned for reconsideration, contending that the ICC erred in finding no nexus between the requested abandonment and the elimination of the use of MP crews. UTU also argued that the question of the causal connection between the abandonment and any adverse effect on MP employees was not a matter for the ICC to decide, but instead should be resolved by arbitration.

Upon reconsideration, the ICC affirmed its prior decision, but it offered entirely different reasons for again denying UTU's request. The ICC observed that statutory labor protection generally is extended only to employees of the railroad applying for abandonment, in this case Seaboard. The ICC recognized, however, that in *Atchison—Trackage Rights—Chicago*, 338 I.C.C. 778 (1971), and *Baltimore & O.R.R. Abandonment*, 328 I.C.C. 449 (1966), it had accorded protection to employees of a nonapplicant carrier who had operated cars for the applicant carrier over the track proposed for abandonment. According to the ICC, the linchpin that permitted such an exception was the "close working relationship" of the non-applicant employees with the applicant railroad such that the non-applicant employees could be considered "joint employees" of the two railroads. The ICC stated that UTU had produced no evidence to establish such a relationship between MP employees and Sea-

board. Thus, affirmance of its initial decision was required.[8]

UTU subsequently petitioned to reopen the proceeding in an attempt to furnish the ICC with evidence of a "close working relationship" between MP employees and Seaboard. It called attention to the facts present in the record surrounding Yard Center's operation, as well as the fact that Seaboard's Hammond cars had been manned exclusively by MP employees prior to October 1984. UTU also filed a Union official's affidavit verifying those facts and stating that although MP employees at Yard Center were under MP supervision, a Seaboard official was "close by." The ICC accepted the additional evidence, but in a third decision it concluded that UTU had failed to establish, through the type of evidence presented in *Atchison* and *Baltimore*, that MP employees had a close working relationship with Seaboard. The ICC claimed that two types of evidence had determined the outcomes in *Atchison* and *Baltimore:* (1) non-applicant employees were shown to be "closely supervised" by the applicant and (2) the operating agreement between the carriers provided that the applicant would reimburse the non-applicant for the costs of operating the trains. Absent evidence that Seaboard closely supervised MP employees or that Seaboard reimbursed MP for the use of its employees, the ICC refused to extend protection to MP employees. This petition for review followed.

## II

In this court, the government supports the ICC's ruling by advancing the

---

7. The relevant portion of the initial decision states:

> The rerouting of traffic away from [MP] employees occurred because of management action, rather than Commission regulation. Regardless of whether [Seaboard] abandons the track, it was entitled to reroute the cars in question without first obtaining Commission approval, and the filing of the abandonment application does not now require us to impose labor protection for the benefit of [MP] employees affected by the rerouting.

*Seaboard System R.R.—Abandonment Exemption—Lake County, In.,* I.C.C. Docket No. AB–55 (Sub-No. 127X), slip op. at 2 (February 25, 1985).

8. The ICC's second decision reads in part:

> In this proceeding, UTU presents no evidence to show that MP employees had a close working relationship with [Seaboard]. Absent such evidence, we cannot determine that MP employees are "employees" to be accorded the protection of the *Oregon III* conditions. If we had determined that MP employees should be accorded protection, only then would the question of whether MP employees were adversely affected by the abandonment be an appropriate matter to be resolved by arbitration.

*Seaboard System R.R.—Abandonment Exemption—Lake County, In.,* I.C.C. Docket No. AB–55 (Sub-No. 127X), slip op. at 2 (June 18, 1985).

reasons given in the ICC's initial decision. It argues that the rerouting of Seaboard traffic, rather than the abandonment proceeding, was the actual cause of any adverse effect on MP employees.

We reject this argument on two grounds. First, the ICC's initial rationale for denying UTU's request is not entirely consistent with that stated in its later decisions. If the ICC had adhered to its initial reasoning, it would have been unnecessary for it to consider whether MP employees had a close working relationship with Seaboard. Yet, in its second and third decisions, the ICC departed from its original position and assumed that MP employees would be entitled to labor protection if they were found to be joint employees of Seaboard and MP. We therefore conclude that the ICC abandoned its original position and substituted another basis for its ruling.

■ Second, even if we were to consider the reasoning adopted in the ICC's initial decision, we would conclude that the ICC was in error. The rerouting and the abandonment were not actions independent of each other; rather, they were for all practical purposes made simultaneously and were interdependent.

■ Turning to the "joint employee" issue, we conclude that the determinative facts here and those in *Atchison* and *Baltimore* are almost identical. The ICC in *Atchison* and *Baltimore* focused on the fact that the non-applicant employees operated the cars of the applicant carrier, just as MP employees did for Seaboard. The following statement from *Baltimore* is particularly relevant to the instant situation:

> Because of the immediacy of the relationship between the Central employees and the B & O, ... we find that the employees of Central, to the extent that they operated the trains of B & O and otherwise serviced and maintained the necessary equipment and tracks in support of B & O's operations, are for purposes of this proceeding, the joint or common employees of Central and B & O. In our opinion, the above-described employee-employer relationship between such employees and B & O clearly justifies the imposition upon the B & O of employee-protective conditions for the benefit of those employees who have or will be adversely affected as the result of the abandonment.

*Baltimore*, 328 I.C.C. at 456–57.

In its third decision, the ICC for the first time claimed that the joint employee exception also required evidence that the applicant railroad "closely supervised" the employees of the non-applicant. Yet nowhere in either *Atchison* or *Baltimore* is there a single reference to "close supervision." The ICC also erroneously required (again, waiting until its third decision) proof of the financial arrangement between Seaboard and MP relating to MP's servicing of Seaboard's Hammond traffic. Although in *Atchison* and *Baltimore* there was evidence of a financial arrangement between the railroads, in neither case was the financial information dispositive. In any event, the inference is inescapable that Seaboard reimbursed MP for its employees' services. Without doubt, MP did not furnish its crew to Seaboard without charge.

### III

We conclude that the ICC's determination was arbitrary and capricious and contrary to law. Therefore, the petition for review is granted and the decisions of the ICC are set aside. We remand to the ICC for further proceedings consistent with this court's opinion.