**CSX TRANSPORTATION, INC., Petitioner,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents.**

United Transportation Union General Committee of Adjustment, C & T, Baltimore & Ohio System, Intervenor.

No. 95–1162.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 7, 1995.

Decided Feb. 16, 1996.

Jeffrey S. Berlin, Washington, DC, argued the cause, for petitioner, with whom Mark E. Martin and James D. Tomola, Jacksonville, FL, were on the briefs.

Louis Mackall, V, Attorney, Interstate Commerce Commission, Washington, DC, argued the cause, for respondents, with whom Henri F. Rush, General Counsel, John J. McCarthy, Jr., Associate General Counsel, Anne K. Bingaman, Assistant Attorney General, U.S. Department of Justice, John J. Powers, III, Attorney, and Robert J. Wiggers, Attorney, were on the brief. Virginia Strasser, Attorney, Interstate Commerce Commission, entered an appearance.

William G. Mahoney and Richard S. Edelman, Washington, DC, were on the brief, for intervenor.

Before: RANDOLPH, ROGERS and TATEL, Circuit Judges.

ROGERS, Circuit Judge:

CSX Transportation, Inc. ("CSXT")[1] petitions for review of the decision of the Interstate Commerce Commission ("ICC")[2] that CSXT's rerouting of all traffic from the Walker–Wilsonburg Line was "in anticipation of" abandonment of that line, and hence employees who were adversely affected qualify for labor protection under the *Oregon Short Line* conditions.[3] Because we conclude that the ICC's decision was not arbitrary or capricious or contrary to law, we deny the petition.

## I.

The Walker–Wilsonburg Line, a 61–mile stretch between Walker and Wilsonburg,

---

1. CSXT is an interstate railroad company subject to regulation by the ICC under 49 U.S.C. §§ 10101–11917 (1988 & Supp. V 1993). The Baltimore & Ohio Railroad Company ("B & O") owned and operated the Walker–Wilsonburg Line at issue for many years. In 1987, B & O merged with the Chesapeake and Ohio Railway Company, which in turn merged with CSXT. For ease of reference we refer to "CSXT" in this opinion except when quoting from other materials.

2. On January 1, 1996, the functions of the ICC were transferred to the Surface Transportation Board in the Department of Transportation. ICC Termination Act of 1995, Pub.L. No. 104–88, 109 Stat. 803 (1995).

3. *Oregon Short Line R.R.—Abandonment—Goshen,* 360 I.C.C. 91, 101 (1979) (*"Oregon Short Line"*).

West Virginia (the "lower route"), contained nine tunnels that were too small to accommodate CSXT's modern freight cars. No local traffic had originated or terminated on the line since at least 1983. On August 1, 1985, CSXT rerouted the last of the "overhead" (non-local) traffic between Cincinnati, Ohio, and Cumberland, Maryland remaining on that route to a more circuitous but less mountainous route between Deshler and Willard, Ohio (the "upper route"), which was able to accommodate the modern freight traffic. CSXT also abolished all train service positions on the lower route, and the affected employees, who are represented by intervenor United Transportation Union ("UTU"), exercised their rights under a collective bargaining agreement to take positions on other CSXT lines.

One year later, on August 29, 1986, CSXT petitioned the ICC for an exemption under 49 U.S.C. § 10505 from the prior-approval requirements of 49 U.S.C. § 10903 to abandon the line.[4] CSXT pointed out that "no traffic has been originated or terminated on the line since prior to 1984." CSXT also advised the ICC that it wished "promptly to apply" the rail components and other reusable materials from the lower route elsewhere on its system. CSXT estimated that the "net salvage value" of the track (excluding real

estate, which CSXT wished to develop "for other than rail purposes") was over two million dollars; it later revised its estimate to $5,154,670 (or $6,875,670 including the land).[5] In approving the exemption, the ICC noted that the line was used principally for the movement of overhead traffic and no traffic had originated or terminated on the line for over two years.[6] The ICC conditioned its approval on CSXT's payment of the *Oregon Short Line* benefits to employees affected by the abandonment.[7]

In opposing a petition for reconsideration filed by the State of West Virginia, CSXT asserted that abandonment of the Walker–Wilsonburg line "simply recognizes the existing actual total discontinuance of service on this line." Describing the line as "entirely unused and redundant," CSXT advised the ICC that there had been no revenue traffic generated on the line in the last three years and that it had advised the State of its plans to abandon the line prior to filing the petition for exemption.[8] Thus, CSXT maintained, it had met the ICC's exemption requirement that the line be out of service for two years. *See Exemption of Out of Service Rail Lines,* 2 I.C.C.2d 146 (1988), *aff'd sub nom. Illinois Commerce Comm'n v. ICC,* 848 F.2d 1246 (D.C.Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989); 49

---

4. Under 49 U.S.C. § 10903, a rail line cannot be abandoned without the ICC's approval. However, under 49 U.S.C. § 10505(a), the ICC is required to exempt from regulation a transaction under two circumstances:

> [T]he Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle [49 U.S.C. §§ 10101–11917]—
> (1) is not necessary to carry out the transportation policy of section 10101 or section 10101a of this title; and
> (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

5. CSXT advised the ICC that purchase of materials of the same type and quality would cost more than ten million dollars.

6. *Baltimore & O. R.R.—Exemption—Abandonment,* Docket No. AB–19 (Sub–No. 125X) (Nov. 17, 1986). Vice Chairman Simmons and Commissioner Lamboley dissented on the ground that

the present record did not support the § 10505 findings.

7. 49 U.S.C. § 10903(b)(2) imposes labor-protective conditions upon railroads that abandon lines or discontinue service. Section 10903(b)(2) provides:

> On approval, the Commission shall issue to the rail carrier a certificate describing the abandonment or discontinuance approved by the Commission. Each certificate shall also contain provisions to protect the interests of employees. The provisions shall be at least as beneficial to those interests as the provisions established under sections 11347 and 24706(c) of this title.

The protections customarily accorded to employees under § 10903(b) are set forth in *Oregon Short Line,* 360 I.C.C. at 98–103.

8. In its opposition, CSXT referred to a meeting in August 1985 at which high-level B & O managers had explained to Congressman Mollohan the railroad's future plans for the line.

C.F.R. § 1152.50(b) (1994).[9] CSXT also noted that those protesting abandonment as adverse to future development had "identified no shippers likely to use the line in the future, no commodities likely to move by rail, and ha[d] presented no reasons why the many commonly available alternatives to B & O service on this line ... would be inadequate...." Moreover, CSXT noted the absence of offers to purchase the line.[10] The ICC granted reconsideration, but affirmed its earlier decision, again noting both that the line was used primarily for the movement of overhead traffic, and that CSXT had moved no local traffic on the line for at least three years.[11] The ICC observed that "the B & O began rerouting the overhead traffic in August 1985, and it was that action that most directly led to filing the petition for exemption." [12]

Thereafter, certain UTU employees who had been dismissed or displaced as a result of the rerouting submitted a request for protective benefits to CSXT. When CSXT denied the request, the dispute was submitted to binding arbitration under Article I, § 11 of *Oregon Short Line*. In arbitration, the UTU employees maintained their entitlement to benefits under Article I, § 10 of the *Oregon Short Line* conditions on the ground that the

rerouting had been done "in anticipation of" the later abandonment of the lower route. Article I, § 10 provides that:

> Should the railroad rearrange or adjust its forces in anticipation of a transaction with the purpose or effect of depriving an employee of benefits to which he otherwise would have become entitled under this appendix, this appendix will apply to such employee.

*Oregon Short Line,* 360 I.C.C. at 101.

Arbitrator Marx, citing the statement in the ICC's conditional approval of the abandonment that the rerouting led most directly to the abandonment, found a causal connection between the rerouting and the abandonment and that the rerouting and the abandonment were "intertwined," as in *Black v. ICC,* 814 F.2d 769, 772 (D.C.Cir.1987) (per curiam). In *Black,* the court reversed the ICC's decision denying labor protection under 49 U.S.C. § 10903(b)(2), where a rerouting that eliminated an operation and the need for its crew preceded by three days the railroad's petition for abandonment of that operation. The ICC had found no nexus between the two actions, reasoning instead that the rerouting was the sole source of any

9. 49 C.F.R. § 1152.50(b) provides that:

> An abandonment or discontinuance of service ... is exempt [from 49 U.S.C. §§ 10903–10905] if the carrier certifies that no local traffic has moved over the line for at least 2 years and any overhead traffic on the line can be rerouted over other lines and that no formal complaint filed by a user of rail service on the line (or a State or local government entity acting on behalf of such user) regarding cessation of service over the line either is pending with the Commission or any U.S. District Court or has been decided in favor of the complainant, within the 2–year period....

10. Only after the ICC's decisions approving abandonment and denying reconsideration did a potential forced-sale purchaser of the lower route emerge, making an offer of financial assistance of $2.1 million that was later withdrawn. *Baltimore & O. R.R.—Exemption—Abandonment,* Docket No. AB–19 (Sub.–No. 125X) (Jan. 27, 1988); *Baltimore & O.R.R.—Exemption—Abandonment,* Docket No. AB–19 (Sub.–No. 125X) (Feb. 26, 1988); *see* 49 U.S.C. § 10905.

11. *Baltimore & O.R.R.—Exemption—Abandonment,* Docket No. AB–19 (Sub.–No. 125X), 1987 WL 98310 (Apr. 17, 1987). Vice Chairman Lam-

boley and Chairman Simmons again dissented. Upon a petition for review brought by the State, the court affirmed the ICC's decision to grant the exempted abandonment. *West Virginia v. ICC,* 841 F.2d 1162 (D.C.Cir.1988) (per curiam).

12. The ICC, in rejecting West Virginia's objections to the abandonment, explained that:

> B & O began rerouting the overhead traffic only after several years of study. Over the years, rail car dimensions changed. Demand for 15–foot high boxcars substantially changed to a demand for larger cars. Because there were tunnels on the line that could not accommodate larger cars, the problem on the east-west route between Cincinnati and the east coast got worse over time as car dimensions increased.
>
> Although B & O in the 1960's eliminated tunnels by converting them to open cuts when that was cost effective, there still were 9 tunnels on the Walker–Wilsonburg line segment when overhead traffic was rerouted. By 1985 clearance restrictions prevented the Cincinnati-east coast overhead traffic route over this line from handling 40 percent of the traffic. (footnotes omitted)

impact on the employees. 814 F.2d at 771. The court concluded that the ICC had erred because "[t]he rerouting and the abandonment were not actions independent of each other; rather, they were for all practical purposes made simultaneously and were interdependent." *Id.* at 772. Following this reasoning, Arbitrator Marx ruled that the affected UTU employees were protected under the *Oregon Short Line* conditions.

CSXT appealed, and the ICC vacated Arbitrator Marx's decision.[13] The ICC concluded that Marx had misinterpreted its conditional approval of the abandonment by assuming that because there were no employees on the line at the time of the abandonment, the ICC must have intended to protect the employees affected by the rerouting; the ICC explained that it routinely applied the conditions to satisfy the statutory mandate. The ICC also concluded that the arbitrator had placed undue reliance on its statement that the rerouting most directly led to the abandonment; that statement was not, the ICC explained, a finding that employees were entitled to labor protection under *Oregon Short Line.* Moreover, the ICC concluded that the arbitrator had failed to make independent findings of fact.

When the parties could not resolve their dispute, a second arbitration commenced. Arbitrator Scearce thereafter ruled that the employees were not entitled to labor protection because they had failed to show that CSXT had taken an action with the purpose of depriving employees of such protection. In Scearce's view, because the rerouting was done for a valid business purpose, it could not, as a matter of law, have been done for the purpose of depriving employees of labor protection. The UTU petitioned the Commission for review of Arbitrator Scearce's

decision,[14] and the ICC decided, in effect, that Arbitrator Marx was correct after all.[15]

The ICC ruled that CSXT was obligated to pay the protective benefits to employees adversely affected by the 1985 rerouting because the rerouting of traffic was done "in anticipation of" the 1986 abandonment of its railroad line. The ICC determined that under § 10 the employee was required only to show that the railroad displaced the employee (1) in anticipation of a transaction, and (2) with the purpose or effect of depriving the employee of benefits. The ICC acknowledged that its statement in denying reconsideration to West Virginia, that CSXT had rerouted the traffic for a legitimate business purpose, was misleading. "[W]e appeared to be saying that, if an action occurring prior to an abandonment was taken for valid efficiency reasons, that action could not be viewed as having been taken in anticipation of the abandonment. By inference, the type of actions that would be so viewed would have to be those that had no valid business purpose." The ICC explained that its statement was too narrow:

> In retrospect, that interpretation of section 10 of *Oregon Short Line* seems too narrow. Here, the B & O rerouted all overhead traffic on a line that carried no local traffic. The record contains no evidence that the B & O had any prospect of obtaining new local traffic on the line. If the rerouting of overhead traffic on the Walker–Wilsonburg Line was not interdependent with the abandonment, it would be hard to imagine a situation where interdependence could be found.

The ICC noted that it had not disputed Arbitrator Marx's reliance on the interdependence test and endorsed the concept that an action that is "interdependent with or intertwined with an abandonment is certainly

**13.** *Baltimore & O.R.R.—Exemption—Abandonment,* Finance Docket No. 31566, 1990 WL 300539 (Nov. 26, 1990). The UTU petitioned for review of that decision, but the court dismissed the petition for lack of a final agency order. *United Transp. Union v. ICC,* 951 F.2d 1324 (D.C.Cir.1991) (mem.).

**14.** The ICC agreed to hear the review as a "recurring or otherwise significant issue[ ] of general importance regarding the interpretation of our

labor protective conditions." *Chicago & N.W. Transp. Co.—Abandonment,* 3 I.C.C.2d 729, 736 ("*Lace Curtain* "), aff'd sub nom. *International Bhd. of Elec. Workers v. ICC,* 862 F.2d 330 (D.C.Cir.1988).

**15.** *Baltimore & O.R.R.—Exemption—Abandonment,* Finance Docket No. 31566 (Sub–No. 1), 1995 WL 11226 (Jan. 5, 1995) (Commissioner Owen dissented).

within the ambit of actions taken 'in anticipation of'" an abandonment within § 10. Here, the ICC stated, "[o]nce the overhead traffic was rerouted, the abandonment of the line was inevitable." Responding to the CSXT's concern that its interpretation was too broad, the ICC denied that it was broadening the scope of § 10. Rather:

> [B]ecause CSXT's Walker–Wilsonburg line carried no local traffic, the transfer of all of the line's overhead traffic was tantamount to the abandonment of the line. We agree with UTU that, if this rerouting could not reasonably be characterized as "in anticipation of" the filing of an abandonment application, nothing would. CSXT would not be expected to maintain a line that carried no traffic, and the record contains no evidence that there was any prospect for new traffic. Because a railroad's removal of *all* remaining traffic from a line ordinarily will lead directly and inexorably to abandonment of that line, we deem that action here as falling within the ambit of the term "in anticipation of" abandonment within the meaning of Article I, section 10 of *Oregon Short Line.*

## II.

■ CSXT contends that the ICC acted arbitrarily and capriciously in imposing *Oregon Short Line* § 10 labor conditions in the absence of a finding that CSXT rerouted traffic from the lower route in 1985 with the expectation that it would later abandon the line, or that at the time of rerouting CSXT had any intent to abandon the line in the future. Relying on ICC doctrine that a rerouting is not an abandonment, CSXT maintains that there was neither a basis for the ICC to find that the rerouting and the abandonment were "interdependent" as in *Black,* 814 F.2d at 772, nor evidence to support the ICC's view that the abandonment was inevitable once the rerouting occurred. Instead, CSXT maintains that the ICC has made "a universal pronouncement that removal of all revenue traffic from a rail line will inexorably lead to the line's abandonment." Brief for Petitioner at 13. Because CSXT views its original action as a rerouting and not an abandonment, it concludes that the ICC has

imposed a new burden on a railroad's ability to reroute traffic.

■ The *Oregon Short Line* labor protective conditions are designed to ensure that "employees adversely affected by rail line abandonments are entitled to the same protection imposed in consolidation cases." *Oregon Short Line,* 360 I.C.C. at 92. After the Supreme Court instructed the ICC that it had authority to impose labor-protective conditions in abandonment proceedings, *ICC v. Railway Labor Executives' Ass'n,* 315 U.S. 373, 376–80, 62 S.Ct. 717, 719–21, 86 L.Ed. 904 (1942), the ICC promulgated the so-called *Burlington* conditions to govern abandonments. *Chicago, B. & Q. R.R.—Abandonment,* 257 I.C.C. 700 (1944). When Congress required in 1976 that the protective conditions for abandonments "be at least as beneficial to [the employees'] interests as the provisions established" for consolidations and those for Amtrak employees (the so-called "Appendix C–1" conditions), Railroad Revitalization and Regulatory Reform Act of 1976 ("4R Act"), sec. 802, § 1a(4), 90 Stat. 31, 128, *codified as amended at* 49 U.S.C. § 10903(b)(2) (1988), the ICC in *Oregon Short Line* increased the abandonment protections to the same level as the *New York Dock* conditions for consolidation cases. *Oregon Short Line,* 360 I.C.C. at 93–95; *New York Dock Ry.—Control—Brooklyn E. Dist. Terminal,* 360 I.C.C. 60, 84–90 (1979), *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979). Historically an outgrowth of congressional concern for balancing the twin public interests of management efficiency through railroad consolidation and labor stability, the labor-protective conditions provide for ninety days' notice of the transaction, and negotiation, backed by binding arbitration, of any disputes, as well as benefits for lost income and various expenses for up to six years for adversely affected workers. *See generally Norfolk & W. Ry. v. American Train Dispatchers' Ass'n,* 499 U.S. 117, 120–21, 132–33, 111 S.Ct. 1156, 1159, 1165, 113 L.Ed.2d 95 (1991); *American Train Dispatchers Ass'n v. ICC,* 54 F.3d 842, 844 (D.C.Cir.1995) *(American*

*Train), cert. denied,* —— U.S. ——, 116 S.Ct. 1261, —— L.Ed.2d —— (1996).

▓▓▓ The ICC's decision interpreting the conditions that it announced in *Oregon Short Line* is entitled to considerable deference, "'even greater deference'" than when an agency interprets a statutory term. *Consolidated Rail Corp. v. ICC,* 43 F.3d 1528, 1532 (D.C.Cir.1995) (quoting *Capital Network Sys., Inc. v. FCC,* 28 F.3d 201, 206 (D.C.Cir. 1994)); *see also Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The court will defer to an agency's interpretation of its own rules unless the agency's conclusion was "'plainly erroneous or inconsistent with the regulation.'" *Railway Labor Executives' Ass'n v. United States,* 987 F.2d 806, 818 (D.C.Cir.1993) (per curiam) (quoting *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)). On the other hand, such deference is appropriate only when the meaning of the words used is "doubtful or ambiguous." *American Train,* 54 F.3d at 848. Because the *Oregon Short Line* conditions were "crafted" by the ICC "pursuant to authority granted by Congress," in which task the ICC had "a broad measure of discretion with respect to the actual formulation," they are treated like regulations for purposes of our review. *Id.*

In requiring the payment of *Oregon Short Line* benefits to employees who were adversely affected by the rerouting, the ICC concluded that the 1985 rerouting of all overhead traffic from the lower route was tantamount to an abandonment of that route. This conclusion is supported by substantial evidence. The Walker–Wilsonburg line had carried no local traffic since at least 1983. There was no realistic prospect of new local traffic, and there were no prospective buyers in sight. CSXT confronted the dual problem of having nine tunnels on the lower route that prevented the use of modern freight traffic cars needed to remain competitive,

and of having valuable reusable assets tied up in a non-revenue-producing route. In 1985 CSXT transferred all of the overhead traffic to other lines that could handle the modern freight traffic. Concomitant with the rerouting, CSXT abolished all train service jobs on the lower route. A year later, CSXT filed a petition for an exempted abandonment of the lower route. Under the circumstances, the ICC reasonably concluded that the rerouting and the abandonment were "virtually one and the same," noting that CSXT could be expected neither to maintain a line that carried no traffic where there was no evidence of any prospect of new traffic, nor to leave a valuable asset lying dormant when it had identified other productive uses for it. CSXT itself explained in opposition to West Virginia's petition for reconsideration:

> In this case, there is no dispute that there has been no overhead traffic on the line for more than a year, and no local traffic for more than *three* years. Moreover, the evidence (affidavit of James R. Bradley) shows that the absence of overhead traffic is not merely temporary, but is permanent. Abandonment of this line thus simply recognizes the existing actual total discontinuance of service on the line, and therefore fits exactly within the Commission's long-standing view of what constitutes an abandonment of limited scope, as that term is used in 49 U.S.C. 10505.

CSXT would now avoid the import of its previous position, that the rerouting and the subsequent abandonment petition were related. Yet the context surrounding the rerouting decision, as elaborated in the ICC's decision on West Virginia's petition for reconsideration of the exemption decision, *see supra* note 12, supports the finding that CSXT undertook the rerouting so that it could abandon the lower route.[16] The ICC

---

16. CSXT's understanding of the probable result of its rerouting of all overhead traffic on the lower route is clear from its statement, in opposing reconsideration, that:

> What the State's argument on this point [that regulation is required to prevent circumvention of a regular abandonment application] boils down to is an assertion that the Commission would surely deny a regular application to abandon a line that has been entirely unused

for more than three years, from which all overhead traffic has been efficiently rerouted for more than a year, on which no traffic is likely to be generated in the foreseeable future, and when there is no protest from any actual or even potential shipper on the line. It is hardly surprising that West Virginia has not cited even a single past such abandonment decision to support this novel argument, because Commission precedent is so clear that

reasonably found that there was no indication that CSXT's delay in seeking abandonment was based on any intent or purpose to resume rail service on the line. Rather, CSXT filed promptly for an abandonment when it believed it qualified for an exemption under § 10505.[17]

In interpreting its own *Oregon Short Line* conditions, the ICC concluded that the employees were entitled to the *Oregon Short Line* benefits because the rerouting was "in anticipation of" the abandonment. Under the ICC's interpretation of § 10, a railroad will be held to have intended the probable consequences of its actions. Confronted with no clear, unambiguous meaning of the phrase "in anticipation of," the ICC could reasonably rely on circumstantial, objective evidence of CSXT's conduct as evidence of its intent. Thus, the ICC could properly infer anticipatory action from the evidence that CSXT, having evaluated the competitive situation and the revenue-producing capacity of the line, took the actions that naturally led to an abandonment. *Cf. Winter v. ICC,* 828 F.2d 1320, 1323 (8th Cir.1987). Hardly reading "in anticipation of" out of § 10, the ICC has simply interpreted the phrase to focus on the probable consequences of the railroad's action and its effects on its employees, and has rejected CSXT's view that there must be subjective evidence of CSXT's intentions or plans for the Walker–Wilsonburg line after the rerouting.

■ CSXT makes much of a dictionary definition of "anticipation" as meaning "expectation" or "realization in advance."[18] Yet CSXT would ignore the objective evidence

before the ICC that CSXT actually realized in advance where its rerouting would lead. In addition, even when "anticipation" is defined in terms of subjective expectation, the record supports the inference that in rerouting and taking no further actions to resume service, CSXT expected that once the lower route was out of service for two years it would likely qualify for exemption-from-regulation abandonment. *Cf. Argento v. Village of Melrose Park,* 838 F.2d 1483, 1497 (7th Cir.1988) ("Whether an injury was expected is a subjective question, but a subjective expectation can be inferred from objective evidence that the injury was the natural and probable result of the act." (citations omitted)). Clearly, the ICC was not required to adopt CSXT's argument that the phrase "in anticipation of" requires an employee to show the railroad's plans. Not only could such a *mens rea* requirement create a difficult burden of proof, *cf. Kungys v. United States,* 485 U.S. 759, 799, 108 S.Ct. 1537, 1561, 99 L.Ed.2d 839 (1988) (Stevens, J., concurring in the judgment) ("Because states of mind are notoriously difficult to prove, an objective test also has the critical virtue of diminishing the risk of erroneous determinations."), it would ignore the fundamental purpose of the labor-protective benefits, which focus on the effect of the railroad's actions on its employees rather than on the railroad's motives in acting. *American Train,* 54 F.3d at 844, 851. Likewise, the ICC's interpretation is consistent with its decisions holding that where there is evidence that a railroad has ceased all services on the line, a rerouting will be considered to be an abandonment.[19]

such an application would be granted. Indeed, the Commission would not even entertain such an application today because in *Exemption [of Out of Service Rail Lines,* 2 I.C.C.2d 146] it has preexempted all such abandonments as a class.

17. CSXT notes that the initial decision of the ICC to preexempt all lines that had been out of service for two years was vacated in *Illinois Commerce Commission v. ICC,* 787 F.2d 616 (D.C.Cir. 1986), and that the ICC's revised decision did not take effect until after CSXT had filed its petition for exemption. *See Exemption,* 2 I.C.C.2d 146. However, CSXT's petition did rely on the fact that the lower route had been out of service (no local traffic) for at least two years and on parts of the first *Illinois Commerce Commission* decision,

787 F.2d at 628–29, that supported some of the ICC's findings underlying the initial exemption decision. Indeed, in that case the court declined to upset the ICC's finding that a two-year period was enough to qualify a railroad for exemption. *Id.* at 632–34. It is reasonable to infer that in petitioning for exemption CSXT realized that the lower route's being out of service for at least two years increased its chances of being exempted from full regulatory review.

18. Random House Dictionary of the English Language 90 (2d ed.1987).

19. When a railroad reroutes overhead traffic from a line with no local customers, the Commission will not find an abandonment "[w]ithout

*New York, N.H. & H.R.R.—Abandonment (Portion) Pomfret–Putnam, Conn.,* 312 I.C.C. 465, 469 (1961), *aff'd sub nom. Smith v. United States,* 211 F.Supp. 66 (D.Conn. 1962); *Buffalo & S. R.R.—Abandonment,* 254 I.C.C. 303, 310–14 (1943).

Thus, the ICC's construction of the phrase "in anticipation of" sensibly conforms to the purpose and wording of § 10. We find no reason to prefer CSXT's alternative interpretation of the ICC's own conditions, and we certainly cannot say that the ICC's reading is "plainly erroneous or inconsistent with the regulation." *Cf. Bowles,* 325 U.S. at 414, 65 S.Ct. at 1217. We have no occasion to decide what evidence, if any, CSXT could have provided to overcome the UTU's objective evidence that the rerouting was an anticipatory abandonment under § 10 because CSXT offered none.[20] Contrary to CSXT's contention, the ICC did not rule that anytime a railroad reroutes all traffic from a line it will automatically find an abandonment, with the attendant labor-protective conditions. Rather, the ICC emphasized that the record provided no evidence that, under the circumstances, CSXT could reasonably have hoped for any disposition of the line other than abandonment.

Accordingly, because CSXT has failed to show that the ICC was arbitrary and capricious in interpreting § 10 not to require a showing by the employee of the subjective intent of the railroad at the time of the rerouting, we deny the petition.

evidence of cessation of service, as opposed to lack of operations." *Brotherhood of Locomotive Eng'rs,* Financial Docket No. 31047, slip op. at 2 (Mar. 11, 1988).

20. Although CSXT asserts in its brief on appeal that after the rerouting a second group of employees remained on the lower route to provide maintenance-of-way and signal services, Petition-er's Brief at 32 & n. 16, CSXT offered no evidence to show that these employees were related to any plan to resume service. Rather, in applying for an exemption, CSXT stated that the "abandonment exemption . . . [would] free it from the burdens associated with ownership and maintenance of the line."